FMC CORPORATION and FMC Acquisition Corporation, Plaintiffs,

v.

R. P. SCHERER CORPORATION, Wilber H. Mack, Paul Marco, William C. Stutt, Richard A. Manoogian, James S. Ludwick, John S. Scherer, Peter R. Fink, Heinrich Koepff, Dean E. Richardson, Karla Scherer Fink and Deutsche Gelatine Fabriken Stoess & Co. G.m.b.H., Defendants.

Civ. A. No. 82–461.

United States District Court, D. Delaware.

Aug. 5, 1982.

Rodman Ward, Jr., Carolyn Berger, Anthony W. Clark, of Skadden, Arpts, Slate, Meagher & Flom, Wilmington, Del., for plaintiffs FMC Corp. and FMC Acquisition Corp.; Peggy L. Kerr, Dana H. Freyer, Jemera Rone, and Peter Zurkow, New York City, of counsel.

Jack B. Jacobs, and Josy W. Ingersoll, of Young, Conaway, Stargatt & Taylor, Wilmington, Del., attorneys for intervening plaintiffs; Dean A. Dickie, William Gleeson, Marvin A. Tenenbaum, Fay Clayton, and Sarah R. Wolff, of Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., of counsel.

Martin P. Tully, A. Gilchrist Sparks, III, and Thomas J. Allingham, of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., attorneys for R. P. Scherer Corp.; Steven M. Barna, Theodore N. Mirvis, Paul K. Rowe, and Richard B. Skaff, of Wachtell, Lipton, Rosen & Katz, New York City, of counsel.

R. Franklin Balotti, Jesse A. Finkelstein, Samuel A. Nolen, of Richards, Layton & Finger, Wilmington, Del., for defendant Deutsche Gelatine Fabriken Stoess & Co., G.m.b.H.; Kelly R. Welsh, Lynn M. Raimondo, of Mayer, Brown & Platt, Chicago, Ill., of counsel.

OPINION

MURRAY M. SCHWARTZ, District Judge:

Plaintiffs, FMC Corporation and FMC Acquisition Corporation, a wholly owned

subsidiary of FMC Corporation, (jointly "FMC"), seek a preliminary injunction enjoining R. P. Scherer Corporation ("Scherer"), its officers, directors and anyone acting in concert with them or on their behalf from holding the August 9, 1982 [1] annual shareholder meeting; soliciting any proxies with respect to any amendments to Scherer's Certificate of Incorporation; or voting their shares or proxies in favor of those proposed charter amendments at the August 9 meeting.[2] (Amended Complaint at 23 (Docket No. 30)). This action arises in the context of FMC's tender offer to acquire 4,100,000 shares or 52.5% of Scherer common stock at $22 per share which was announced on July 20, 1982. The complaint was filed on July 20. Defendant's answer and counterclaim was filed on July 29, 1982. (Docket No. 24). Plaintiffs' proposed amended complaint was filed on August 2, 1982. (Docket No. 30). On August 3, 1982 the Court granted the motion of Robert Pauli Scherer, III, Lesley Elder Scherer, Stephen Marshall Scherer, Mark Conrad Scherer and Mary Herman, individually and on behalf of the four previously named individuals (collectively the "intervenors") to intervene. A hearing was held on plaintiffs' motion for a preliminary injunction on August 4, 1982 after the parties had taken expedited discovery. That motion will be denied as to all plaintiffs because none has made the required showing that without the requested relief they will suffer irreparable injury during the pendency of this litigation.

On June 30, 1982, Scherer mailed a proxy statement to its stockholders in preparation for its annual stockholders' meeting. That proxy statement included a proposal to amend various articles of Scherer's Certificate of Incorporation and By-laws. At the same time FMC announced its tender offer it announced that it intends to solicit proxies from Scherer shareholders in an attempt to defeat the proposed amendments. This lawsuit challenges the adequacy of the disclosures made to the Scherer stockholders in the Scherer proxy materials. Plaintiffs assert that the Scherer proxy materials are materially false and misleading in violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78n(a). In addition, plaintiffs allege that the proposed amendments, as well as certain previously adopted provisions, constitute manipulative and deceptive devices in violation of Sections 14(e), 15 U.S.C. § 78n(e), and 10(b), 15 U.S.C. § 78j(b) of the Act and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5 promulgated thereunder. Plaintiffs also allege violations of Section 13(d), 15 U.S.C. § 78m(d) and Rule 14d–9, 17 C.F.R. § 240.14d–9.

*The Scherer Proxy Statement*

As disclosed in the Scherer proxy statement three amendments to the corporation's Certification of Incorporation are proposed. At the heart of those amendments is the so-called "supermajority" proposal which would require the approval of 80% of the stockholders for certain business combinations involving Scherer and any entity already owning 10% or more of Scherer's common stock. The amendments would also create a category of "continuing directors" who would have the power to waive the 80% requirement thus allowing a proposed combination to be approved by a simple majority of the stockholders as is currently the case. In addition, the proxy statement discloses that the Board of Directors has adopted various amendments to the corporation's bylaws to become effective if and when the amendments to the Certificate of Incorporation become effective.

*FMC's Tender Offer*

As disclosed in FMC's offer to purchase ("offer"), that offer is conditioned upon, among other things, at least 1,700,000

---

1. That meeting was originally scheduled for August 5, 1982.

2. In addition FMC originally sought a preliminary injunction enjoining defendant Deutsche Gelatine Fabriken Stoess & Co. G.m.b.H. ("DGF") from directly or indirectly exercising a certain option (the so-called "DGF option").

That request was withdrawn at oral argument though counsel reserved the right to argue that the DGF option, which will be discussed below, is a manipulative device and should have been more fully disclosed in the Scherer proxy materials.

shares being validly tendered and not withdrawn prior to the offer's expiration. The offer to purchase also states that the "purpose of the offer is to acquire for cash a majority interest in the Company [Scherer] as a first step in acquiring the entire equity interest in the Company." Offer § 11 at 14. After setting out the gist of the proposed amendments discussed above, the offer states that if its offer is successful it is FMC's present intention to propose a merger between Scherer and a subsidiary of FMC pursuant to which the remaining Scherer stockholders would receive a payment of $18 for their shares.

Section 14 of the offer to purchase lists eight conditions of the offer in addition to the proper tender and nonwithdrawal of at least 1,700,000 shares. All of those conditions are stated to be "for the sole benefit of FMC and the Purchaser [FMC Acquisition Corporation] and may be asserted by FMC or the Purchaser regardless of the circumstances giving rise to any such conditions or may be waived by the Purchaser in whole or in part." Offer § 14 at 20. The last of those conditions, subsection (h), gives FMC the right to terminate the offer if: "the stockholders of the company shall have adopted the Supermajority Provisions or the Company or any of its affiliates shall have adopted or proposed any other amendments to its Certificate of Incorporation or by-laws...." Offer § 14 at 20. As reflected in its first amendment to its Schedule 14D–1 FMC later restricted its options by eliminating its ability to waive the above quoted condition. The amendment states, in part, "FMC intends to terminate the offer without purchasing any shares if the Supermajority Provisions are adopted by stockholders." (Amendment No. 1 to the Schedule 14D–1 of FMC Acquisition Corporation, dated July 22, 1982, Ward Affidavit Exhibit 9 at 2 (Docket No. 33)). However, in its third amendment to its Schedule

14D–1 FMC announced that it is "reassessing its previously announced intention of terminating the Offer if the Supermajority Provisions are adopted by the Company's stockholders." (Amendment No. 3 to the Schedule 14D–1 of FMC Acquisition Corporation, dated August 2, 1982 (Docket No. 71)).

*Plaintiffs' Contentions*

FMC challenges the Scherer proxy materials in its capacity as a tender offeror and proxy contestant.[3] The intervenors challenge those materials in their capacity as Scherer stockholders who wish to accept FMC's offer. Although those capacities are relevant to the nature of the injury alleged by each, their basic contentions as to defendants' actions are the same.

Plaintiffs allege that the proposed amendments are part of an ongoing scheme to perpetuate the control of Scherer's president and chief operating officer, Peter Fink, his wife Karla Scherer Fink (who owns or controls approximately 24% of Scherer's common stock) and a small group of Scherer stockholders and directors (the "group"). Plaintiffs contend that the group, which currently controls approximately 48% of Scherer common stock have put forward the proposed amendments as part of an ongoing manipulative scheme to maintain control of Scherer and run it as if it were a privately owned corporation in violation of Sections 10(b) and 14(e) of the Act.[4] Essentially it is Scherer's failure to disclose the existence of that ongoing manipulative scheme at various times and in various required filings which forms the basis of plaintiffs' claims under Section 14(a) and Rule 14d–9.

Given the Court's view of this case it is unnecessary to detail each of plaintiffs' contentions. A somewhat simplified overview will suffice. Plaintiffs allege that the proposed amendments operating in conjunction with the so-called "DGF Option" which will be discussed below, and various previously

---

3. FMC is also the record holder of 100 shares of Scherer stock but it is unclear whether it advances a separate challenge to the Scherer proxy materials in that capacity. In any event to the extent that such a challenge could be presented it is addressed by the Court's discussion of the intervenors' contentions.

4. The alleged violation of Section 13(d) involves the failure to fully disclose the existence of the group in a timely manner.

adopted provisions serve to lock up control of Scherer and therefore place an artificial cap on the market price for Scherer stock by deterring competitive bidding. By conditioning a takeover on approval either by the continuing directors or the vote of 80% of the stock, the proposed amendments would make a hostile takeover impractical if not impossible.

The "DGF Option" refers to an option which was granted to Deutsche Gelatine Fabriken Stoess & Co. G.m.b.H. ("DGF") by Scherer in 1979. The option would allow DGF to acquire a valuable West German subsidiary of Scherer in the event that a third party acquired control of Scherer in a transaction opposed by Scherer's Board of Directors. Plaintiffs allege the DGF Option together with the supermajority provisions constitute an absolute deterrent to any tender offer not approved by the group and would insulate Scherer's stock from the normal forces of the marketplace. The DGF option and supermajority provisions are therefore alleged to impose an artificial cap on the market price for Scherer stock.

Plaintiffs also allege that the Scherer proxy materials are false and misleading in that, *inter alia*, they fail to adequately disclose that: 1) the sole or primary purpose of the supermajority proposal is to prevent unwanted tender offers and perpetuate the control of Scherer's president and chief executive officer, Peter Fink, and his wife Karla Scherer Fink; 2) that the Finks have arranged with several other major stockholders to obtain their support of the antitakeover proposals; 3) under the new provisions the Finks could veto any business combination without regard for the interests of other Scherer stockholders; 4) the effect of the proposed continuing directors classification would be the disenfranchisement of other future directors; 5) the proxy proposals are illegal under various provisions of state law; and 6) the stock controlled by the Scherer family (or descendents of the company's founder) has decreased since mid-1979 while that controlled by the Finks has increased and the purpose and effect of the amendments is to prevent the further erosion of the Finks' control over Scherer.

*Preliminary Injunction*

The Court of Appeals for the Third Circuit set out the standard to be applied in evaluating a request for preliminary injunctive relief in *Eli Lilly and Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120 (3d Cir.), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980). In order to obtain a preliminary injunction the moving party must demonstrate:

> (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... Moreover, while the burden rests upon the moving party to make these requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest".... While these factors structure the inquiry, however, no one aspect will necessarily determine its outcome. Rather, proper judgment entails a "delicate balancing" of all elements. On the basis of the data before it, the district court must attempt to minimize the probable harm to legally protected interests between the time that the motion for a preliminary injunction is filed and the time of the final hearing.

630 F.2d at 136 (quoting *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir. 1978)); *A. O. Smith v. FTC,* 530 F.2d 515 (3d Cir. 1976).

On the facts of this case, involving at best minimal allegations of irreparable injury, the Court need not extend its inquiry beyond that element. It is in this context of analyzing the various allegations of irreparable injury that the various capacities in which plaintiffs appear before the Court become important. FMC's allegation of irreparable injury to it in its capacity as a tender offeror is based on its assertion that if it goes through with its offer and the proposed illegal amendments are adopted through the use of misleading proxy mate-

rials the Finks would be granted a veto power over FMC's proposed merger. FMC asserts that the existence of such a veto power would leave it with a large block of Scherer stock for which it paid a premium of over 90% and no damage remedy for the frustration of its merger plans. Faced with that possibility FMC argues that it has only two choices; delay the tender offer until after the Court passes on the validity of the vote at the stockholder meeting, or cancel the tender offer altogether. It is FMC's position that being forced to choose among these three alternatives would amount to irreparable harm.

FMC's scenarios are not, however, the only possibilities. Given the proper showing at a final hearing on the merits, this Court has the power to set aside a stockholder vote and require both a new solicitation of proxies and a second stockholder vote. *See, e.g., Bertoglio v. Texas International Co.,* 472 F.Supp. 1017, 1021 (D.Del.1979). Thus, if the Court were ultimately to conclude that FMC were correct in its contentions regarding Scherer's proxy statement the Court could void the stockholder vote and order that the proposed amendments be resubmitted for stockholder approval.

FMC's first alternative is in reality non-existent. It cannot be locked into its block of Scherer stock by virtue of the Finks' illegally acquired veto power because any such power would be voided by the Court. The existence of the Court's power, which FMC concedes, *see* Plaintiffs' Opening Brief at 60 (Docket No. 70), also casts the latter two alternatives in a different light. The only reason given for choosing either alternative is the avoidance of the first. But, as noted, the first alternative, as hypothesized by FMC, does not exist. There is, however, a fourth alternative very similar to the first which may explain FMC's reluctance to pursue its offer absent a ruling by this Court.

If FMC were to complete its offer and the proposed amendments were adopted and upheld then the Finks would be granted a veto power over FMC's proposed merger. In that case FMC might well be left with a large block of Scherer stock and be unable to consummate the merger which was the motivation for its tender offer. But that frustration, caused by the legitimate actions of a business rival, would not constitute a legally cognizable injury, let alone an irreparable injury such as would justify the granting of a preliminary injunction. *See Continental Group, Inc. v. Amoco Chemical Corp.,* 614 F.2d 351, 356 n.9 (3d Cir. 1980). Similarly, in its capacity as a proxy contestant FMC argues that it will be irreparably harmed if it loses its proxy contest with Scherer because of the latter's use of false and misleading proxy materials. But if, in fact, a Court were to find that Scherer's proxy materials were materially false and misleading it would simply set aside the vote and order a new contest.

The intervenors' allegations of irreparable harm are also inadequate. The intervenors allege two separate categories of harm which will befall them if the supermajority provisions are adopted. In the short run, intervenors argue, they will be harmed because FMC will abandon its offer and they will be denied the opportunity to tender their shares. The loss to the intervenors was estimated by counsel at oral argument to be approximately $2,500,000. That is, the price FMC offers for their shares would net the intervenors approximately $2,500,-000 more than they would have realized had they sold their shares on the open market during the period immediately preceding the announcement of FMC's offer. That harm, a loss of money, can be remedied by a post-transaction suit for damages in an appropriate forum. Inasmuch as an adequate remedy at law is available to correct the harm alleged the equitable relief requested would be inappropriate. *Goadby v. Philadelphia Elec. Co.,* 639 F.2d 117 (3d Cir. 1981).

Intervenors allege that they will be harmed in the long run because the supermajority provisions will act to depress the market value of their stock and will also discourage other potential tender offerors

from seeking to acquire Scherer by offering premiums to the stockholders. The quick answer to this contention is as explained above, viz., if the intervenors are correct, a final merits determination would eradicate this aspect of their alleged irreparable injury. The intervenors attempted to counter that answer by asserting at oral argument that they would suffer irreparable injury because some potential offerors might be deterred during the months intervening before a final merits determination. However, there is no record support for the proposition that such offers might be forthcoming during that time but for the adoption of the supermajority provisions. Vague, speculative conjecture as to the existence and terms to be offered by an unknown, potential tender offeror pending a final merits determination does not constitute immediate irreparable harm sufficient to support the grant of a preliminary injunction in this case.

In closing the Court emphasizes what this case does not involve. Plaintiffs are not attempting to enjoin a merger or other corporate activity which would require the Court to "unscramble the eggs" if preliminary injunctive relief were erroneously withheld. Nor is this a case in which the supermajority provision was proposed as a defensive measure in response to a pre-existing hostile tender offer. FMC undertook its tender offer and proxy solicitation with full knowledge of both the proposed amendments and the fact that those amendments would probably be adopted if the meeting took place as scheduled.[5]

In short, FMC knowingly structured the transaction in such a way that it would be forced to "take down" the tendered stock while the legal status of the supermajority proposal remained uncertain. It now seeks to reduce the risks inherent in the situation it created by obtaining a preliminary indication as to the legality of the supermajority proposal (and so as to the feasibility of its ultimate goal of merger) from this Court before it makes a financial commitment.

5. The facts contrasted in the text are not presented by the instant case and the Court

In so doing, it raises difficult questions as to the appropriate role of the federal courts and grave implications for the administration of justice. Assuming, without deciding, that there are conceivable instances in which it would be appropriate for a federal court to give such an indication, the Court finds that to do so in the context of granting the extraordinary relief of a preliminary injunction would be inappropriate on the facts of this case.

An order denying both FMC's and the intervenors' motions for a preliminary injunction will be entered.

expresses no opinion as to what effect, if any, they would have on the outcome.