**D & N FINANCIAL CORPORATION, Plaintiff,**

v.

**RCM PARTNERS LIMITED PARTNERSHIP, G & G Partners Limited Partnership, Schwartz/Coville Partnership, Schwartz Investment Counsel, Inc., George P. Schwartz, Richard J. Nelson and G. Robert Reichenbach, Defendants.**

Civ. A. No. 90–157–JJF.

United States District Court, D. Delaware.

April 24, 1990.

Carl H. vonEnde, and Mark T. Boonstra, of Miller Canfield Paddock & Stone, Detroit, Mich., Michael D. Goldman, James F. Burnett, and Stephen C. Norman, of Potter Anderson & Corroon, Wilmington, Del., for defendants.

## OPINION

FARNAN, District Judge.

## I. FACTS

### A. *Introduction*

This case essentially involves a dispute between a savings bank and its largest shareholder over the bank's recent poor financial performance and what should be done about it. Plaintiff is D & N Financial Corporation (hereinafter "D & N"), a corporation with its principal place of business in Hancock, Michigan. Its sole subsidiary is D & N Savings Bank, a federally chartered stock savings bank with $2.6 billion of assets. These assets were mostly acquired from the lending of depositors' funds for real estate loans and other types of investments. The defendants are all members of the Committee of Concerned D & N Shareholders ("the Committee"). The Committee owns beneficially 9.8% of the issued and outstanding shares of D & N's common stock, thus making the Committee the largest shareholder of D & N.

The Committee's driving force is defendant George P. Schwartz ("Schwartz"). On April 6, 1989, a company of which Schwartz is a director and which is not a defendant in this action, Schwartz Management Company ("SCM"), filed with the Securities and Exchange Commission ("SEC") a Schedule 13D ("13D") on its behalf and on behalf of other companies which are defendants in this action. The 13D concerned the common stock of D & N and stated that the filing parties intended to hold their shares of D & N "for investment purposes and to possibly influence shareholders, the Board of Directors and management, to explore options for maximizing shareholder value." The crux of the dispute in this case centers on the ways in which Schwartz and the other defendants

Honigman Miller Schwartz & Cohn, Detroit, Mich., R. Franklin Balotti, Gregory P. Williams, Anne C. Foster, William P. Bowden, Joseph R. Slights, III, and Matthew J. Ferretti, of Richards Layton & Finger, Wilmington, Del., for plaintiff.

in this action have chosen to influence shareholders and the ways in which the defendants have chosen to explore maximization of shareholder value.

The 13D filed on April 6, 1989 listed, in addition to SCM, defendants RCM Partners Limited Partnership ("RCM"), G & G Partners Limited Partnership ("G & G") and Schwartz/Coville Partnership ("SCP") as beneficial owners of D & N stock. RCM, G & G and SCP engage principally in the business of investing in securities, with RCM and G & G being Michigan limited partnerships and SCP being a Michigan general partnership. On October, 12, 1989, the 13D was amended to add defendants Schwartz, Schwartz Investment Counsel, Inc. ("SIC") and Richard J. Nelson ("Nelson"). SIC, a Michigan corporation and a registered investment advisor, engages principally in the business of providing investment counselling services. In addition, Schwartz is a director and the president of SIC. Nelson is a director and the president of LaSalle Capital Management, Inc., a Michigan corporation which engages in management consulting. Although apparently not listed in the 13D, defendant G. Robert Reichenbach ("Reichenbach") is an investment analyst with SIC and a member of the Committee.

D & N named all of the defendants listed above when it brought this action on April 4, 1990 by filing a complaint and a motion for preliminary injunction. (Docket Item ("D.I.") 1 and 2). In those pleadings, D & N contends that the proxy materials issued by the defendants on March 30, 1990 violate § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) (1981 & 1990 Supp.). In its complaint, D & N asserts that the Court should enjoin the defendants "preliminarily and permanently, from soliciting or delivering proxies or voting any shares of D & N stock in connection with their proxy solicitation." Complaint, ¶ 23 (D.I. 1). The shareholders' meeting at which the proxies are to be voted will be held on Wednesday, April 25, 1990. The parties have engaged in expedited discovery, submitted briefing on D & N's motion for a preliminary injunction and argued their positions to the Court at oral argument on Friday, April 20, 1990. The motion for a preliminary injunction is thus ready for a decision and this Opinion shall constitute the Court's findings of fact and conclusions of law as required by Fed.R. Civ.P. 52(a) and 65(d).

## B. *Background*

In December of 1989, D & N announced that as a result of a balance sheet restructuring and modifications to its loan and loss reserves, it had experienced a net loss of $9.4 million. On March 9, 1990, D & N restated the loss at $10.4 million. In addition to the 10.4 million loss, D & N has had unrealized losses of approximately $40 million in certain structured portfolio investments. These losses and the stricter capital requirements of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, Pub.L. No. 101–73, 103 Stat. 183 (1989), confirmed the defendants' long-held suspicions about the financial health of D & N. Since 1988 the defendants, led by Schwartz, had been concerned about management's investments in junk bonds, mutual funds, derivative mortgage instruments and other similar types of investments. Schwartz considered these investments to be risky and believed that they were undertaken because of the inability of D & N's management to produce satisfactory operating profits from traditional thrift activities. Initially the defendants sought to have D & N dispose of these types of investments; however, D & N's management refused.

As a result of the Committee's concern for the present and future profitability of D & N, defendants Schwartz and Reichenbach met with Kenneth D. Seaton ("Seaton"), D & N's Chairman and Chief Executive Officer, in April of 1989 to discuss D & N's financial health. Schwartz and Reichenbach implored Seaton during the meeting to explore the possibility of the sale of D & N. Seaton, however, advised them that he felt that it was not the right time for D & N to consider a sale. Disappointed with Seaton's response, Schwartz wrote to all the directors of D & N on May 1, 1989, reiterating his prior message to Seaton

about the sale of D & N. In his letter, Schwartz also suggested that a committee of outside directors be appointed to explore the merits of an affiliation, sale or merger with a larger institution. The Board of Directors (the "Board" or "D & N Board"), however, followed Seaton's path and rejected the suggestions.

Obviously frustrated with the lack of response from D & N management and Board of Directors, Schwartz, on behalf of the other defendants in this action, began his own search for a potential purchaser for D & N. In July of 1989, Schwartz initiated conversations with Robert Mylod ("Mylod"), the Chairman, Chief Executive Officer and President of Michigan National Corporation ("Michigan National") regarding the possible acquisition of D & N by Michigan National. As a result of these preliminary talks between Mylod and Schwartz, the Michigan National team met on different occasions with Schwartz, Reichenbach and their associates for the purposes of exchanging financial and other information about the possible acquisition of D & N by Michigan National.

During those meetings, Schwartz, Mylod and their "teams" discussed the price per share at which D & N could be acquired and, in this regard, Mylod was keenly interested in what price range Schwartz would be willing to support a sale or merger transaction. Mylod found Schwartz interested and supportive of a Michigan National offer in the $20 to $22 per share range. This was at a time when the market price of D & N stock was trading between $10 and $14 per share. Schwartz believed the $20 to $22 figure represented a substantial premium to all shareholders of D & N and so he suggested that Mylod contact D & N's management to further discuss a sale or merger. Mylod agreed that the matter should move along and offered to contact D & N's chairman, Seaton.

Schwartz, believing that a deal should be struck between Michigan National and D & N at the $20 to $22 price range, made three attempts in late 1989 to influence the D & N Board: a September 8, 1989 letter ("September 8, 1989 letter") to the D & N Board; an October 17, 1989 letter ("October 17,

1989 letter") to D & N director Peter Van Pelt ("Van Pelt"); a request to have included in D & N's proxy materials a shareholder proposal. The September 8, 1989 letter was sent to each member of the D & N Board and essentially recommended to them that Schwartz believed the timing was right to sell D & N. In that letter, Schwartz advised:

> I have reviewed my analysis of D & N with the management of a major financial institution. In doing so, I of course emphasized the positives of D & N as much as possible. The CEO of that particular institution and his staff have made an extensive study of D & N with my assistance. He has concluded that his bank is willing to make a cash offer substantially above the market for all the outstanding stock of D & N if you, the directors, are willing to cooperate.

In response to Schwartz's letter, the Board declined to pursue the matter.

In Schwartz's October 17, 1989 letter to Van Pelt, an outside member of the D & N Board, Schwartz advised Van Pelt that Michigan National "wants to acquire D & N Financial at a significant premium over the current market price" and that Michigan National "indicated a willingness to pay approximately twice the current market price if D & N directors will cooperate." At a D & N board meeting on October 23, 1989, the Board met with D & N's counsel and investment banker and, after discussing the Schwartz letters of September 8, 1990 and October 17, 1990, determined that this was not the right time to sell.

Meanwhile, while Schwartz was writing to the D & N Board, Mylod on behalf of Michigan National, attempted three times to arrange meetings with Seaton to discuss the possible sale of D & N to Michigan National. Seaton, later asserting that he was "busy", failed to return one of Mylod's phone calls despite that Seaton knew of Mylod's interest in D & N. However, on the two occasions when Seaton and Mylod spoke, Seaton said that it was not the right time for D & N to discuss an acquisition

because D & N was in the process of restructuring its balance sheet.

Frustrated by the D & N Board and management's failure to respond to Mylod's overtures on behalf of Michigan National, Schwartz decided to submit to other stockholders of D & N a proposal (the "Proposal") at the upcoming shareholders' meeting on April 25, 1990. The Proposal recommended that the D & N Board "appoint a special committee to solicit, review and negotiate offers to acquire the Company on terms that are in the best interest of the Company's shareholders." In the Proposal, Schwartz also stated he "has reason to believe that management has received inquiries from larger financial institutions regarding the acquisition of the Company." The Proposal was presented to D & N on November 21, 1989, and, not surprisingly, it was opposed by the Board.

On December 18, 1989, D & N formally notified Schwartz that his Proposal would not be included in management's proxy materials, and, at the same time, D & N filed materials with the SEC attacking Schwartz's Proposal as being legally improper, false and misleading. In response to this action by the D & N Board Schwartz decided to commence his own proxy contest by which the defendants would seek the election of Schwartz and Nelson to D & N's Board and the adoption of the Proposal. On February 19, 1990, Schwartz informed D & N he was withdrawing his request to include his previous shareholder proposal in management's proxy materials. Having abandoned their effort to be included in D & N's proxy materials, the defendants mailed their own proxy materials on March 30, 1990, thereby seeking election of two directors approved by the defendants and passage of the Proposal rejected by D & N. D & N claims these proxy materials make statements which are false and misleading and therefore requests that the proxy solicitation be stopped.

## II. DISCUSSION

### A. *Allegations*

Plaintiff challenges as misleading statements made by the defendants in a March 30, 1990 letter ("March, 30, 1990 letter") to shareholders and in a Proxy Statement ("Proxy Statement"), both of which were contained in defendants' proxy materials. Plaintiff claims that the challenged statements in these two documents violate § 14(a) of the Securities Exchange Act of 1934 ("§ 14(a)"), 15 U.S.C. § 78n(a) (1981 & 1990 Supp.), and therefore it is entitled to preliminary injunction preventing the defendants from voting the proxies at D & N's annual meeting on April 25, 1990. Defendants contend that the statements made in the March 30, 1990 letter and Proxy Statement are neither false nor misleading. Defendants further argue that, even if the statements are misleading, both have been "cured" by defendants' April 14, 1990 letter to the shareholders (the "April 14, 1990 letter"). The Court will examine the standards for a preliminary injunction before turning to a fuller analysis of the plaintiff's allegations.

### B. *The Standards for a Preliminary Injunction*

In order to obtain a preliminary injunction, the moving party must demonstrate:

(1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted.... [W]hile the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*Eli Lilly Co. v. Premo Pharmaceutical Laboratories, Inc.,* 630 F.2d 120, 136 (3d Cir.) (quoting *Constructors Association of Western Pennsylvania v. Kreps,* 573 F.2d 811, 814–15 (3d Cir.1978) (citations and footnotes omitted)), *cert. denied,* 449 U.S. 1014, 101 S.Ct. 573, 66 L.Ed.2d 473 (1980).

D & N thus must make an initial showing that there is a reasonable probability of success on its claim that the March 30, 1990 letter contains materially false and misleading statements and that the Proxy

Statement also contains false and misleading statements.

■ Proof of probability of success on the merits does not relieve the plaintiff from meeting the other requirements imposed by the other three criteria for a preliminary injunction. The quantum of evidence needed to prove probability of success, however, meshes with the quantum of evidence necessary to meet those other requirements. *See Polaroid Corp. v. Disney*, 862 F.2d 987, 1006 (3d Cir.1988) (discussing the link between proof of reasonable probability of success on the merits and proof of irreparable harm and harm to the public interest in a securities law case). Accordingly, a failure to show a reasonable probability of success on the merits will assume greater significance than the other factors where "the threatened irreparable injury is limited or is balanced to a substantial degree by countervailing injuries which would result to third parties, or to the public interest from the issuance of the injunction...." *Constructors Association of Western Pennsylvania v. Kreps*, 573 F.2d 811, 815 (3d Cir.1978).

1. Reasonable Probability of Success on the Merits

■ Section 14(a) of the Securities Exchange Act of 1934 provides in pertinent part that:

It shall be unlawful for any person ... in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of inventors, to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section [12] of this title.

15 U.S.C. § 78n(a). Section 14(a)'s "language dictates that as a prerequisite to recovery, a complainant initially must prove that his proxy was solicited in a contravention of an SEC rule or regulation. In addition, he must prove injury ... (citations omitted). Finally, he must demonstrate a causal relationship between the violation of the rule or regulation and the injury." *Ash v. GAF Corp.*, 723 F.2d 1090, 1092–93 (3d Cir.1983). A corporation, just as a shareholder, possesses standing to sue under § 14(a) and thus must meet the three prerequisites to recovery. *Dillon v. Berg*, 326 F.Supp. 1214, 1218 n. 2 (D.Del.), *aff'd*, 453 F.2d 876 (3d Cir.1971); *see also Studebaker Corp. v. Gittlin*, 360 F.2d 692, 694–95 (2d Cir.1966).

Therefore, D & N must first prove that proxies were solicited in contravention of an SEC rule. In this case, D & N relies on Rule 14a–9(a), which provides as follows:

No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9(a) (1989).

In order to succeed on its claim under § 14(a) and on Rule 14a–9(a), D & N must show (1) that the Proxy Statement and March 30, 1990 letter are false or misleading or omitted facts necessary to prevent statements made from being false or misleading and (2) that the misstatements or omissions are material. *See TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 444, 96 S.Ct. 2126, 2130, 48 L.Ed.2d 757 (1976); *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 385, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970). "An omitted [or misrepresented] fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... Put another way, there must be a substantial likelihood that the disclosures of the omitted [or misrepresented] fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of informa-

tion made available." *TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132.

As the United States Supreme Court has noted, "the notion of materiality assumes heightened significance" in an analysis of a § 14(a) case. *Id.* at 444, 96 S.Ct. at 2130. Courts do not "require proof that material omissions or misstatements in a proxy statement decisively affected voting". *Basic Inc. v. Levinson*, 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). Once a plaintiff has proven the materiality of a false proxy statement, he "has made a sufficient showing of causal relationship between the violation and the injury for which he seeks redress if ... he proves that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Mills*, 396 U.S. at 385, 90 S.Ct. at 622. Accordingly, the Court will review the March 30, 1990 letter and Proxy Statement in order to determine if D & N has a reasonable probability of success in showing a material misstatement or omission.

### (i) *The March 30, 1990 Letter*

D & N singles out one paragraph in the March 30, 1990 letter for scrutiny. In explaining the defendants' rationale for their proxy solicitation, the Committee states:

> We consider our proposal to be especially timely since approximately six months ago, at our urging, a large Michigan-based financial institution [Michigan National] made overtures to D & N's management to discuss acquiring D & N at a price that we think would have been advantageous to our shareholders. To the best of our knowledge, D & N's management has refused to explore these overtures and has not communicated these inquires to shareholders.

D & N charges that the quoted language is misleading in three respects. First, plaintiff contends that the March 30, 1990 letter would lead a reasonable shareholder to conclude that the large financial institution discussed a specific price for the acquisition of D & N with the D & N Board of Directors and that D & N's Board of Directors refused to discuss any acquisition of D & N. Second, plaintiff claims that the March 30, 1990 letter leaves the impression that the large financial institution is ready to take over D & N immediately without any conditions attached. Third, the plaintiff charges that the March 30, 1990 letter omits to inform the shareholders that any discussion concerning a takeover is "highly confidential" and does not necessarily have to be revealed to shareholders. *Cf. Basic Inc.*, 485 U.S. at 231, 108 S.Ct. at 983 (overabundance of information is of dubious significance to shareholders).

Defendants counter by arguing that the letter is not misleading because the quoted language only refers to a general discussion between a large institution and D & N's Board of Directors. Defendants assert that a reasonable shareholder would conclude that the reference to price in the quoted language only refers to a price which the defendants believed could be obtained for the company, not a price which the large financial institution offered to the D & N Board of Directors.

Second, defendants point out that the March 30, 1990 letter expressly noted that the large financial institution would only consider a takeover if the conditions met its approval. As the March 30, 1990 letter stated,

> As more fully explained in our proxy statement, a number of conditions would have to be satisfied before D & N could be sold. Also, there can be no assurances that D & N could be sold or, if sold, sold at a favorable price.

The defendants' proxy statement elaborated on the March 30, 1990 letter:

> Moreover, there can be no assurances that the Company could be sold, or, if sold, sold at a favorable price. Finally, matters such as the preparation of an acquisition agreement satisfactory in form and substance, the satisfaction of closing conditions contained therein, obtaining all necessary government approvals, possible votes of the board of directors and the shareholders of the Company and any other constituent corporation, and satisfactory due diligence, among other things, would have to be accomplished in order for any closing of

sale to take place. Until the form of any transaction becomes more definite, it is not possible to know what other conditions may have to be satisfied.

Third, because defendants contend price was not discussed, defendants argue that D & N's concern about its duty not to reveal "highly confidential" information is misplaced and an attempt to deflect attention from D & N's duty to embrace offers advantageous to its shareholders.

The defendants supplement their three arguments by pointing to their April 14, 1990 letter. In that letter the defendants discuss this lawsuit and the allegations made by D & N in its complaint. On page two of the seven-page letter, the defendants inform the shareholders of the following:

> In its complaint filed against the Committee, management of D & N has alleged that our description of these contacts in our prior letter to you is false and misleading, among other reasons, because, as alleged by management, "[t]here simply was no overture wherein a price was discussed." The Committee's previous description of the contacts should not be construed as implying that we believe price was discussed in the contacts made with Mr. Seaton. Since November 1989, there has been no further expressions of interest by such a large financial institution in acquiring D & N communicated to or discussed with the Committee.

Defendants assert that this letter corrects any "ambiguities" which might have resulted from the March 30, 1990 letter's discussion of price and the impact that discussion would have on D & N's concern about "highly confidential" information. Furthermore, the April 14, 1990 letter also informed the shareholders about the conditional nature of any takeover discussions:

> As disclosed in our proxy statement, there are a number of conditions which must be satisfied before an offer to acquire D & N can be completed. Among other things, D & N's shareholders would have approve such an acquisition at another meeting of shareholders. Moreover, there can be no assurances that an acquisition of D & N be complet-

ed or, if completed, completed at a favorable price.

D & N responds to defendants' "cure" argument by claiming (1) that the language quoted above is "buried" in the April 14 letter and is not available to the average shareholder and (2) that, even if it were available to the average shareholder, the "cure" is inadequate.

Despite D & N's claim about the "cure's" insufficiency, the Court concludes otherwise. In its complaint, D & N claimed that the March 30, 1990 letter misled the shareholders because "D & N's management never discussed with Michigan National (or any other Michigan based financial institution), a specific price, or even a range of prices at which such an institution would acquire, or even discuss acquiring, D & N." Complaint, ¶ 17 (D.I. 1). As plaintiff's complaint indicates, its central concern was correcting any alleged misrepresentation which planted a false impression in the minds of shareholders about the discussion of price:

> By stating that an overture had been made to discuss acquiring D & N at a specific price, and that such price "would have been advantageous to [D & N] shareholders," defendants are attempting to mislead the D & N shareholders into believing that conditions are ripe for the sale of the Company, that the Proposal should be adopted and the dissident slate should be elected. There was simply no overture wherein a price was discussed and this Court should enjoin defendants from continuing their efforts to deceive the D & N stockholders. In addition, defendants' statement that D & N management has failed to explore, or communicate to stockholders of D & N, overtures to discuss acquisition of D & N at an advantageous price is false and misleadingly attempts to impugn the board and management of D & N in order to wrongfully garner support for the Proposal and the defendants' proposed slate of directors.

Complaint, ¶ 18 (D.I. 1).

■ The Court need not address whether the March 30, 1990 letter contains material-

ly misleading statements because, even if the Court were to conclude that it does, the concerns raised in the complaint about the misleading nature of those statements have been explicitly addressed by the Committee's April 14, 1990 letter. For example, the April 14, 1990 letter specifically states that the defendants do not believe that price was discussed between Michigan National and the D & N Board of Directors. *See Denison Mines, Ltd. v. Fibreboard Corp.*, 388 F.Supp. 812, 818 (D.Del.1974) (finding a proxy material's statements not misleading where based upon a "good faith estimate"). As the shareholders have been informed that price was not discussed, the Court concludes that the defendants did not wrongfully omit informing the shareholders that the discussion of price was "highly confidential." The April 14, 1990 letter states "[s]ince November, 1989, there have been no further expressions of interest by such a large financial institution in acquiring D & N communicated to or discussed with the Committee."

Furthermore, the April 14, 1990 letter emphasizes to the shareholders that:

**YOU SHOULD KNOW THAT IN ITS COMPLAINT MANAGEMENT DOES NOT DENY THAT THE CONTACTS WITH MR. SEATON WERE MADE.**

The "total mix" of information thus conveys to the shareholders that the defendants seek not a takeover of D & N by a particular company at a particular price, information which arguably is confidential. Rather, the "total mix" of information indicates that the defendants seek an open analysis by the shareholders of the general receptivity of D & N's Board to overtures and contacts from other institutions concerning the sale of D & N.

■ The April 14, 1990 letter further informs the shareholders that "there are a number of conditions that must be satisfied before an offer to acquire D & N can be completed." The Court thus concludes that the defendants' "cure" adequately informs the shareholders that a favorable takeover of D & N was not guaranteed and that significant conditions had to be met in order to consummate any transaction. Fi-

nally, the Court finds unpersuasive the plaintiff's argument that the cure is inadequate because defendants' curative statement is not contained on the front page of the April 14, 1990 letter. Rather than being hidden, defendants' statements are on the second page of the letter under a bold heading stating: **MAXIMIZING SHAREHOLDER VALUE.** In the paragraph below that heading, the defendants unequivocally state that the "previous description of the contacts should not be construed as implying that we believe price was discussed in the contacts made with Mr. Seaton." Given the straightforward language employed by defendants, the Court concludes that the disclosure is adequate and that the placement of the statement on the second page does not affect the "cure". *See Ash v. LFE Corp.*, 525 F.2d 215, 219 (3d Cir.1975) (a three-page separation between a statement alleged to be misleading and the statement which clarifies the alleged misleading statement does not violate the "equal prominence" rule); *Kohn v. American Metal Climax, Inc.*, 458 F.2d 255, 267 (3d Cir.), *cert. denied*, 409 U.S. 874, 93 S.Ct. 120, 34 L.Ed.2d 126 (1972) ("Reasonable latitude in this area is important if nitpicking is not to become the name of the game.").

Accordingly, the Court concludes that the March 30, 1990 letter is not materially misleading because the " 'total mix' of information available to shareholders", including "other publicly disseminated information of which the shareholders are presumably aware....", cures the possibility that the statements challenged by D & N are false or misleading. *Bertoglio v. Texas International Co.*, 488 F.Supp. 630, 642 (D.Del.1980). Consequently, the Court concludes that, as a result of the April 14, 1990 letter, the plaintiff has no reasonable probability of success on its claim regarding the March 30, 1990 letter.

(ii) *The Proxy Statement Claim*

■ Plaintiff's second challenge focuses on defendants' Proxy Statement. In that document, the defendants stated that:

Since only a shareholder's latest dated proxy will count, a shareholder cannot

vote for both (i) the Committee's nominees on the **WHITE** and (ii) management's nominee(s) on the proxy card distributed by the board of directors. Therefore, choosing to vote for the Committee's nominees on the **WHITE** proxy card is giving up the right to vote for a full slate of four directors. Moreover, a shareholder **CANNOT** use the proxy card supplied by management to vote for the Committee's nominees or the Proposal. To emphasize this point, the proxy statement contained, in the type reproduced below, the following statement:

**YOU CANNOT VOTE FOR THE NOMINEES OF THE COMMITTEE OR THE PROPOSAL BY USING THE PROXY CARD DISTRIBUTED BY THE BOARD OF DIRECTORS.**

Plaintiff's claim that these statements are "simply false" and that the "proxy card accompanying D & N's proxy materials permits D & N shareholders to vote for both management's proposed slate of directors and the Proposal." Plaintiff's Brief in Support of Its Motion for a Preliminary Injunction at 33 (D.I. 15).

In order to rebut the plaintiff's argument, defendants rely on the facts underlying the Proxy Statement. Apparently, Schwartz had requested the Board of Directors on November 21, 1989 to include in D & N's proxy materials the Proposal which was eventually included in the defendants' proxy materials which were released on March 30, 1990. On December 14, 1989 Schwartz supplemented his request for inclusion in D & N's proxy materials by requesting that D & N include in its proxy materials the nomination of three people for the Board of Directors. Shortly thereafter, on December 18, 1989 D & N informed Schwartz that his Proposal would not be included in management's proxy materials. D & N then filed materials with the SEC, claiming that D & N was justified in not including the Proposal in D & N's proxy materials because the Proposal was in violation of the securities laws and SEC rules. Thereafter, Schwartz withdrew his request and the defendants decided to send out their own proxy materials because they believed that management's proxies would

not include the Proposal. The defendants' proxy materials included the Proposal and the nomination of Schwartz and Nelson, a change from Schwartz's December 14, 1989 request to D & N for the nomination of three directors approved by him. D & N, however, cast a shadow on defendants' proxy materials when on April 6, 1990 D & N decided, after communication with the SEC, to include defendants' Proposal in D & N's proxy statements.

As a result of these facts, defendants offer two arguments. First, defendants contend that their Proxy Statement, while incorrect now, was true when issued and is therefore not in violation of § 14(a). Second, they claim that even if the Proxy Statement is false, a corrective disclosure has been made by the April 14, 1990 letter. That letter states:

On April 5, 1990, one day prior to the commencement of its proxy solicitation, D & N filed a complaint in the Federal District Court for the District of Delaware against members of the Committee to enjoin the Committee from soliciting or delivering proxies or voting any shares of D & N stock in connection with the 1990 annual meeting. Management's complaint alleges, among other things, that the statement about proxy materials that "a shareholder cannot use the proxy card supplied by management to vote for the Committee's nominees or the [P]roposal" is misleading because management has included the Committee's Proposal on its proxy card.

You now have the option to vote for the Proposal on management's proxy card or on our **WHITE** proxy card. **WE STRONGLY RECOMMEND THAT YOU VOTE FOR THE PROPOSAL AND THE COMMITTEE'S NOMINEES ONLY ON THE COMMITTEE'S WHITE PROXY CARD.**

Plaintiff claims that this cure is wholly inadequate. Furthermore, in its reply brief, plaintiff asserts that, even if the cure is adequate, that shareholders have inadequate time within which to evaluate the defendants' corrective disclosures and that the "defendants completely omit any expla-

nation of the D & N shareholders' right to revoke proxies which they had previously mailed to defendants on the basis of defendants' false and misleading proxy materials, or any clear instructions as to how revocation can be accomplished." Plaintiff's Reply Brief in Support of Its Motion for Preliminary Injunction at p. 10 (D.I. 21).

■ Defendants' first argument runs afoul of the general rule that material misstatements, if true when made, must be corrected if those statements become false in light of subsequent events. As the Third Circuit Court of Appeals has noted, "if a corporation voluntarily makes a public statement that is correct when issued, it has a duty to update the statement if it becomes materially misleading in light of subsequent events." *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 758 (3d Cir.1984), *cert. denied*, 469 U.S. 1215, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); *see also In re Craftmatic Securities Litigation v. Kraftsow*, 890 F.2d 628, 641 n. 17 (3d Cir.1989) (defendants in a securities violation case "have a duty to disclose additional material facts only to the extent that the volunteered disclosure was misleading as to a material fact.") Nevertheless, the Court need not decide whether the first statements were materially misleading because defendants' statements in their April 14, 1990 letter adequately address the concerns raised by plaintiff's complaint and thus defendants have abided their obligation to dispense accurate information.

In their April 14, 1990 letter, the defendants clearly state that shareholders have "the option to vote for the Proposal on management's proxy card or on our **WHITE** card." In addition, D & N has further supplemented the information in defendants' corrective disclosure by sending a letter to the shareholders on April 13, 1990 (the "April 13, 1990 letter"). In that letter D & N states:

> There are only 12 days left before D & N's annual stockholders' meeting on April 25, 1990.
>
> If you have not yet voted **"FOR"** D & N's nominees as directors and **"AGAINST"** the Committee's Proposal

to sell the Company on the **BLUE** proxy card, we urge you to do so today. Please sign, date and return the **BLUE** proxy card enclosed.

> If you previously returned the Committee's proxy card, you have every right to change your mind by returning the **BLUE** card which will automatically cancel the Committee's card. **Since only the latest dated proxy card is the one that counts, it is very important for you to send us a signed and later dated BLUE proxy card.**

D & N's instructions in its April 13, 1990 letter mirror instructions in the defendants' April 14, 1990 letter. Consequently, the Court concludes that the "total mix" of information available to shareholders adequately informs the shareholders that the shareholders may use management's proxy card to vote for the defendants' Proposal. Furthermore, the "total mix" of information clearly informs the shareholders that a shareholder may revoke a prior filed proxy by filing a new one. In fact, plaintiff's belief in the presumed adequacy of the instructions in the April 13, 1990 letter undermines its present argument that similar instructions in defendants' April 14, 1990 letter are inadequate.

■ Finally, the Court concludes that plaintiff's challenge to the timing of the corrective disclosure is without merit. The Court concludes that in this case the eleven days from the mailing of defendants' April 14 letter (and twelve days from plaintiff's April 13 letter) to the April 25, 1990 meeting date provides "reasonable notice to shareholders to permit any who wish to change their vote to do so." *Howell v. Management Assistance, Inc.*, 519 F.Supp. 83, 88 (S.D.N.Y.1981) (thirteen days is sufficient time to allow stockholders to "file their proxies, change proxies previously filed or re-submit new proxies"), *aff'd*, 685 F.2d 424 (2d Cir.), *cert. denied*, 459 U.S. 862, 103 S.Ct. 138, 74 L.Ed.2d 118 (1982); *see also Abramson v. Nytronics, Inc.*, 312 F.Supp. 519, 523, 525–26 (S.D.N.Y.1970) (fourteen days between annual meeting and an eight-page letter amending proxy materials is sufficient). Accordingly, the Court concludes that the plaintiff has no

reasonable probability of success on the merits of its Proxy Statement claim.

## 2. Irreparable Harm

■ The plaintiff contends that irreparable harm will result if an injunction is not entered. The Court does not agree. First, if plaintiff ultimately proves that the defendants' various statements are misleading, the Court possesses "the power to set aside a stockholder vote and require both a new solicitation of proxies and a second stockholder vote." *FMC Corp. v. R.P. Scherer Corp.*, 545 F.Supp. 318, 322 (D.Del.1982). Second, an injunction is "an extraordinary remedy and must be sparingly granted." *Atlas Corp. v. Blasius Industries, Inc.*, 705 F.Supp. 190, 192 (D.Del.), *aff'd*, 865 F.2d 249 (3d Cir.1988). In this case, the issuance of an injunction will prevent a shareholders' meeting where defendants seek only consideration of two items: 1) placing two members on the eleven member Board of Directors and 2) acceptance of a proposal for a committee to solicit and review opportunities for a maximization of D & N's value. As was noted in another case involving a savings and loan institution:

> Considering that only three seats on the Board are actually at stake, the Court does not consider any harm the plaintiff may have as irreparable at this time. Unlike in a tender offer where it would be "difficult thereafter to 'unscramble the eggs,'" the [defendant group] seeks a voice on the Board and apparently would not be in a position to force an extraordinary transaction without the involvement and agreement of other Board members.

*Poughkeepsie Savings Bank, F.S.B. v. Morash*, [1989 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,422 at 92,724, 1989 WL 40008 (S.D.N.Y. April 14, 1989) (citation and footnote omitted). Consequently, the Court concludes that the plaintiff has failed to demonstrate it will suffer irreparable harm.

## 3. The Interests of Other Persons and the Public Interest

■ The Court's consideration of "whether grant or denial of the injunction is likely to cause harm to other interested persons" has no application to this case. *Polaroid Corp.*, 862 F.2d at 1006. Aside from the defendants and D & N's other shareholders, whose interest D & N has raised in this suit, "no one else appears to have an interest that could be significantly harmed by the grant or denial of the injunction." *Id.* Nevertheless, the Court's consideration of the fourth factor, the public interest, is implicated by this case. Analysis of the public interest supporting an injunction "presents a difficult question." *Polaroid Corp.*, 862 F.2d at 1006. The "public interest" implicated by the issuance of an injunction depends, to a large degree, on the harm the statute sued under was designed to prevent. "Protection of shareholders is the paramount concern of [§ 14(a)] and the rules adopted thereunder by the S.E.C." *Bertoglio*, 488 F.Supp. at 662. In view of the clear purpose of the federal securities law, the Court concludes that the issuance of an injunction would harm the public interest.

First, § 14(a) outlaws false and misleading proxy statements. Because the Court has found that the plaintiff has no reasonable probability of success on its claim under the statute, the Court concludes that the issuance of an injunction would not be in the public interest. Second, defendants do not seek an immediate change in the "corporation's life, to wit, its death", as in a tender offer situation. *SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47 (2d Cir. 1976). Rather, defendants' actions seek only an open analysis of the Board's present attempt to maximize value through restructuring as opposed to other methods. Although present management may not like the means chosen by the defendants to effectuate the consideration of change, the shareholders are being asked to vote upon matters which concern them the most: the available opportunities to maximize value of their stock. Furthermore, even if the defendants succeed in having their two nominees elected to the Board and their Proposal enacted, any change affecting the viability of the corporation will still be sub-

ject to the corporate approval process for such matters. Accordingly, the Court concludes that the issuance of an injunction would threaten the public interest which § 14(a) seeks to promote, *i.e.*, fair corporate suffrage. *See Mills*, 396 U.S. at 381, 90 S.Ct. at 620.

## II.   CONCLUSION

For the reasons stated above, the Court concludes that plaintiff's motion for a preliminary injunction must be denied.   An Order consistent with this Opinion will be entered.