David F. BOLGER, Individually and as Trustee for the David F. Bolger Revocable Trust; and Two–Forty Associates, a limited partnership, Plaintiffs,

v.

FIRST STATE FINANCIAL SERVICES, Defendant.

Civ. A. No. 90–5030.

United States District Court, D. New Jersey.

Feb. 14, 1991.

William R. Thompson, Klehr, Harrison, Harvey, Branzburg & Ellers, Cherry Hill, N.J., for plaintiffs.

Seth T. Taube, McCarter & English, Newark, N.J., for defendant.

## OPINION

LECHNER, District Judge.

This is a motion brought by David F. Bolger ("Bolger") and by Two–Forty Associates, a Pennsylvania limited partnership of which Bolger is the general partner ("Two–Forty Associates") (collectively, the "Plaintiffs"), for preliminary and permanent injunctive relief. The Plaintiffs seek to enjoin First State Financial Services, Inc. ("First State") from holding its 16 January 1991 annual stockholders meeting (the "16 January Meeting"), at which four directors will be elected, until First State has issued corrective proxy statements to shareholders.[1] Jurisdiction is alleged pursuant to § 27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1347.

At the 14 January 1991 oral argument on the application for a preliminary injunction, First State and the Plaintiffs ("the Parties") agreed there was no dispute on the facts. Accordingly, the oral argument on the motion for a preliminary injunction was converted to a final hearing on the merits with respect to permanent injunctive relief, the only relief sought in the complaint.

For the following reasons, as stated on 14 January 1990, the motion for permanent injunctive relief is denied and the Verified Complaint is dismissed.[2]

## FACTS

First State is a Delaware corporation. First State common stock is registered under section 12 of the Securities Exchange Act, 15 U.S.C. § 78*l*, publicly traded in the over-the-counter-market and approved for quotation under NASDAQ. Stipulation of Facts, ¶ 3. The Chairman of the Board and Chief Executive Officer of First State is Michael J. Quigley, III ("Quigley"). *Id.*, ¶ 8.

First State conducts its principal business activity through its wholly owned subsidiary, First DeWitt Savings and Loan Association ("DeWitt Savings"). The principal place of business of DeWitt Savings is

---

1. In addition, First State cross-moves for dismissal of the Verified Complaint of the Plaintiffs, for summary judgment and for sanctions (the "Cross–Motion"). Because the filing of the Cross–Motion was not effected pursuant to the Dispositive Motion Procedure of this court, the cross-motion is not considered in the instant decision.

2. In support of their motion, the Plaintiffs have submitted: the Plaintiffs' Memorandum in Support of their Motion for a Temporary Restraining Order and a Preliminary Injunction (the "TRO Memorandum"); the Plaintiffs' Supplemental Memorandum in Support of their Motion for a Preliminary Injunction (the "Plaintiffs' Supp.Memorandum"); the Case Appendix to Plaintiffs' Brief; and the Plaintiffs' Reply Memorandum in Support of their Motion for a Preliminary Injunction (the "Reply").

In opposition to the motion and in support of its cross-motion, First State has submitted: the Defendant's Brief in Opposition to Plaintiffs' Application for Preliminary Injunction, and in Support of Defendant's Motion to Dismiss Plaintiffs' Verified Complaint, for Summary Judgment and for Sanctions (the "Opposition"); the Case Appendix to Defendant's Brief; the Affidavit of Seth T. Taube (the "Taube Aff."), and all exhibits attached thereto, including the By–Laws of First State Financial Services, Inc. (the "By–Laws"), attached as Exhibit G, the Affidavit of Michael J. Quigley, III (the "Quigley Aff.") and the Supplemental Information to the Proxy Statement (the "Supplemental Proxy Statement"), attached as Exhibit H; the Affidavit of Walter J. Davis (the "David Aff."); and Defendant's 12G Statement.

In addition, the parties submitted Plaintiffs' Stipulation of Facts (the "Stipulation of Facts") and all exhibits attached thereto, including the 3 July 1990 letter from Bolger to First State (the "3 July 1990 Bolger Letter to First State"), attached as Exhibit A, the 30 July 1990 letter from First State to Bolger (the "30 July 1990 First State Letter to Bolger"), attached as Exhibit B, the 8 August 1990 letter from Bolger to First State (the "8 August 1990 Bolger Letter to First State"), attached as Exhibit C, the 21 August 1990 letter from First State to Bolger (the "21 August 1990 First State Letter to Bolger"), attached as Exhibit D, the 30 August 1990 letter from Bolger to First State (the "30 August 1990 Bolger Letter to First State"), attached as Exhibit E, the 17 November 1990 letter from Edmond D. Johnson, counsel to the Special Committee, to Bolger (the "17 November 1990 Johnson Letter to Bolger"), attached as Exhibit F, the First State Financial Services, Inc. 1990 Annual Report (the "1990 Annual Report"), attached as Exhibit G, the Notice of Annual Meeting of Shareholders (the "Notice of Annual Meeting") and Proxy Statement (the "Proxy Statement"), attached as Exhibit H, and the Supplemental Proxy Statement, attached as Exhibit I; and the Defendant's Stipulation of Facts, and all exhibits attached thereto.

West Caldwell, New Jersey. *Id.*, ¶ 3. De-Witt Savings operates ten full-service offices in New Jersey and, as of 30 September 1990, reported total assets of approximately $450,000,000. *Id.* As of 12 December 1990, the number of outstanding First State common stock was 3,175,000 shares. Of this number, the Plaintiffs own 314,325 shares, or 9.9% of total shares, as reported in an amendment to an 11 August 1988 Rule 13d–1 filing submitted to the Securities and Exchange Commission (the "SEC"). *Id.*, ¶ 4.

During fiscal year 1990 (which commenced 1 October 1989), First State reported a second-quarter loss of $2.9 million, compared to earnings of $802,000 for the same period during fiscal year 1989. Losses for the first six months of fiscal year 1990 totalled $2.6 million, compared to earnings of $1.5 million for the same period of fiscal year 1989. *Id.*, ¶ 5. First State's 1990 Annual Report, dated 10 December 1990, attributed these losses largely to the deterioration of the New Jersey real estate market during this period. 1990 Annual Report at 4.

In addition, the price for common stock at the close of trading on 20 December 1990 was approximately $2.13, when at the close of fiscal year 1989 (approximately fifteen months earlier) it had reached a high of $7.625 and a low of $5.625. Stipulation of Facts, ¶ 7.

On 3 July 1990, Bolger began a letter-writing campaign expressing to First State his displeasure with the financial performance of First State for fiscal year 1990; Bolger demanded responsive action by First State. Bolger wrote the first of a series of letters to First State on 3 July 1990. *See* 3 July 1990 Bolger Letter to First State. Bolger complained of the losses suffered by First State in his 3 July 1990 letter, basing his complaints on information contained in the annual and periodic reports issued by First State ·and DeWitt Savings, on SEC filings and on other information available to the public. In addition, Bolger complained of the drop in value of First State stock, of the "erratic pattern of additions to the general loan loss reserves

of DeWitt Savings," and of a perceived conflict of interest by senior directors in approving certain loans made by DeWitt Savings. Bolger also complained of the size of the salaried and ancillary benefits paid to officers and directors and of the 28 June 1990 payment of dividends to shareholders, in light of losses incurred for the quarter ending 31 March 1990. 3 July 1990 Bolger Letter to First State. Finally, Bolger complained that First State's directors "kept the institution wrapped up in the harshest of anti-takeover defenses and insulate[d themselves] and [their] salaries and benefits from the normal disciplines of the market place." *Id.*

Bolger demanded of First State that it provide "answers and explanations regarding the significant losses incurred by First State in recent periods," "the precipitous decline in the market value of First State's common stock," and "the recent trend in additions to [DeWitt Savings'] loan loss reserves." *Id.* at 1. In addition, Bolger demanded that First State "review, and commit to continue to review on an ongoing basis, all business relationships between or involving officers, directors and other fiduciaries of First State and/or [DeWitt Savings]." *Id.* at 2. Bolger further demanded that First State review the performance of Quigley and terminate him if his performance proved to be deficient or derelict, review all officer and director compensation, and "take all appropriate actions to terminate antitakeover defenses, 'golden parachutes' and other impediments to the realization of shareholder value." *Id.* Bolger advised First State he submitted a copy of his letter with his Schedule 13D filed with the SEC.

In response to Bolger's letter, First State established on 18 July 1990 a special committee (the "Special Committee") of the Board of Directors (the "Board") composed entirely of directors independent of the management of First State and DeWitt Savings. Stipulation of Facts, ¶ 14. The Special Committee engaged special independent legal counsel ("Special Counsel") on 15 August 1990 to assist with the investigation to be conducted by the Special Committee. *Id.*, ¶ 15.

First State responded to Bolger's 3 July 1990 letter with a 30 July 1990 letter, in which it advised Bolger: "[A] special committee of the board of directors has been formed to review the issues raised therein. This committee will conduct its review and report to the board in a manner that is appropriate under the circumstances." 30 July 1990 First State Letter to Bolger. First State also informed Bolger:

You should be advised that the board, at this stage, suspects that given the inflammatory, if not inaccurate, incomplete and misleading, nature of various allegations contained in your letters, together with your continued focus on antitakeover aspects of the company's corporate structure (which have been in place from day one of the company's existence and of which you should have been fully aware when you acquired your First State shares), there may be ulterior motives behind both your letters and the method by which they have been publicized by you.

*Id.*

On 8 August 1990, Bolger again wrote to First State. In his 8 August 1990 letter, Bolger again complained of alleged mismanagement of First State's loan portfolio and loss reserves, of the filing of reports with the SEC allegedly rendered false and misleading by their characterization of DeWitt Savings as a "well-run, well-capitalized, profitable institution," of allegedly excessive compensation for management and of the payment of dividends to shareholders. 8 August 1990 Bolger Letter to First State at 2–6. In his 8 August 1990 letter, Bolger demanded that First State and DeWitt Savings take "all appropriate steps, including the institution of litigation," against the officers and directors "responsible for acts of corporate mismanagement, waste of corporate assets, corporate misconduct, and breaches of fiduciary duty, as detailed below and as may be revealed upon further investigation." *Id.* at 1. He stated:

Should you fail to act as outlined here, I shall regard such failure as evidence of control and domination of the Boards of Directors by those responsible for the

wrongful actions described above and evidence of the approval, acquiescence and participation by the majority of the Boards of Directors in the apparently wrongful and unlawful actions described.

*Id.* at 7. Finally, Bolger stated if he did not receive notice that First State was taking appropriate action with respect to his demands within ten working days, he would "take such action on behalf of the shareholders of the Companies, including litigation, as [he] may consider appropriate to redress the wrongs identified. . . ." *Id.* at 8.

On 21 August 1990, First State responded to Bolger's 8 August 1990 letter, advising him his 8 August demands were "under active consideration by the Board of Directors." 21 August 1990 First State Letter to Bolger. It further advised Bolger: "[T]he Board believes that it is unreasonable to expect, indeed that it would be imprudent to attempt to achieve, a decision as to whether the actions demanded should be instituted, within the ten . . . working day time frame demanded in your August 8 letter." *Id.* Bolger was advised he would be notified of the decision of the Board after the Board had finished considering his demands. *Id.*

Bolger's final letter was written on 30 August 1990, in which he stated: "I am pleased to learn from the August 21 letter that 'active consideration' is being given to my demand, as stated in my August 8, 1990 letter, 'that legal action be instituted on behalf of [First State] against certain officers and directors.'" 30 August 1990 Bolger Letter to First State at 1 (bracketed language in original).

Bolger also expressed displeasure that First State had not indicated in its 21 August 1990 letter or in any other correspondence "the nature and the content of the review by the special committee of the Board of Directors", that it had set "no deadline for completion of the Special Committee's deliberations," and that it had not provided the names of the directors appointed to the Special Committee or explained how they are independent. 30 Au-

gust 1990 Bolger Letter to First State. Bolger stated:

I believe that it is imperative that the Special Committee publically [sic] indicate a more proactive approach to this situation. More specifically, I believe that the Special Committee must present a report of the results of its review to the shareholders in sufficient time and in sufficient detail for the report to be considered fully by them prior to the next regular annual meeting of First State's shareholders.

If th[e] discussion [of the issue raised in my letter] is to be productive and is to be carried on in a manner that serves the best interests of First State and [DeWitt Savings], the discussion must be an *informed* discussion. The Directors, and specifically the members of the Special Committee, have a particular fiduciary responsibility to supply the necessary information and to supply it in a timely fashion.

*Id.* at 2 (emphasis in original).

Bolger then demanded that the Special Committee examine additional matters of concern to him. These concerns included whether First State complied with SEC Financial Reporting Release 29 in determining the amounts to be added each quarter to loan loss reserves, whether First State complied with the Statement of Financial Accounting Standards No. 15 in the accounting treatment afforded restructured loans and whether any previous SEC filings required amendment. *Id.* at 2–10. Bolger demanded a "detailed" review of the policies and practices used in making loan loss provisions, of each collateralized loan made by DeWitt Savings which was more than ninety days delinquent and of each modified loan. *Id.* at 5, 10.

Finally, Bolger alleged a failure by First State to comply "with the general standards of full and fair disclosure under the 1933 Act." *Id.* He demanded disclosure of: 1) the nature and content of the review being conducted by the Special Committee, 2) the composition and names of members of the Special Committee, 3) how Special Committee members are independent, 4)

the specific instructions given to the Special Committee, 5) the names of special counsel or other independent advisers to the Special Committee, 6) the timetable for the Special Committee's investigation and 7) the intentions to disclose the Special Committee's findings to the Boards of First State and DeWitt Savings and to shareholders. *Id.* at 11. He stated he expected to hear from First State shortly regarding his demand concerning litigation on behalf of First State and DeWitt Savings. *Id.* at 10.

On 17 November 1990, Edward D. Johnson ("Johnson"), counsel to the Special Committee, wrote to Bolger requesting an interview in connection with its investigation of Bolger's allegations. Johnson stated:

The committee is requesting this interview to ensure that every allegation raised in your demand letter has been thoroughly investigated. We would like to question you concerning the facts underlying the allegations of your demand letter so that the committee will have the benefit of your insights into these matters before reporting its findings.

17 November 1990 Johnson Letter to Bolger. On 14 December 1990, a representative of the Plaintiffs was interviewed with respect to Bolger's allegations. Stipulation of Facts, ¶ 15.

On 12 December 1990, First State mailed its proxy materials to shareholders. Stipulation of Facts, ¶ 18. The Proxy Statement stated two issues are to be voted on at the 16 January 1991 Meeting. First, it stated shareholders are to vote on Bolger's proposal to remove "anti-takeover" provisions from the Certificate of Incorporation. Proxy Statement at 18; Opposition at 10. Second, it stated shareholders are to vote on the re-election of four directors, including Quigley, for terms of three years each. *See* Proxy Statement at 4–5; Quigley Aff., ¶ 2. In addition, the Proxy Statement contained a detailed eleven-page description of the compensation of Quigley and other directors, including information regarding their annual retainer fee and payment for each meeting attended, the cash compensation for Quigley and others, the compensa-

tion provisions in Quigley's employment agreement, retirement plan benefits, insurance plan benefits and bonuses and other compensation features with respect to Quigley and others. Proxy Statement at 7–18.

The four nominees listed in the Proxy Statement are uncontested; neither Bolger nor anyone else nominated a competing slate of candidates. Defendant's Stipulation of Facts, ¶ 9; Quigley Aff., ¶ 2. Because the By–Laws provide directors are elected by a plurality vote, the proposed slate will be elected if any one share is voted for each director. Opposition at 10.[3] It was conceded at the 14 January 1990 oral argument that all nominees own shares of stock in First State.

Bolger filed his Verified Complaint, in which he sought temporary, preliminary and permanent injunctive relief against First State, on the morning of 21 December 1990. In his application, he stated the Proxy Statement was misleading and violated section 14(a) of the Exchange Act because it did not disclose that: 1) the Special Committee had been formed to investigate, among other things, the responsibility of First State officers and directors for the losses suffered by First State, "the precipitous decline in the market value of [First State] stock, the sudden increase in loan loss reserves and the excessive compensation of officers and directors, and [that] 2) the board of directors is actively considering whether to take action against its officers and directors for breach of their corporate and fiduciary duties, mismanagement of loan portfolios, mismanagement of loan loss reserves, and the dissemination of false and misleading public reports." TRO Memorandum at 2.

On 21 December 1990, the Parties appeared in court in connection with the motion by Bolger for a temporary restraining order ("TRO"). Counsel for Bolger represented Bolger did not need a TRO because

there was no threat of irreparable injury if a hearing were to be held prior to the 16 January 1991 Meeting. Taube Aff., ¶ 7. Counsel for Bolger represented Bolger had applied for a TRO primarily to obtain an early return date for the motion for preliminary injunctive relief. *Id.* The request for a TRO was denied and a return date for the preliminary injunction motion was set for 14 January 1991.

On 3 January 1991, First State issued to stockholders the Supplemental Proxy Statement. Stipulation of Facts, ¶ 19. Preliminarily, the Supplemental Proxy Statement advised shareholders the supplemental information was furnished "as a result of the requirement to inform shareholders of certain pending litigation. The litigation referenced below was initiated subsequent to the mailing of the [P]roxy Statement." Supplemental Proxy Statement at 1. It then stated Bolger and Two–Forty Associates commenced an action against First State and brought a motion for a TRO. It advised shareholders:

> Mr. Bolger had previously demanded that the Board of Directors take appropriate steps, including legal action, against those directors and officers of First State, including possibly the nominees proposed by the Board for election by the stockholders at the Annual Meeting, responsible for certain wrongdoing alleged by Mr. Bolger, including corporate mismanagement, waste of corporate assets, corporate misconduct and breaches of fiduciary duty. This demand was previously reported by Mr. Bolger through an amendment to his Beneficial Ownership Report on Schedule 13D. The Board has formed a Special Committee to determine whether there is any merit to Bolger's allegations and demand.

*Id.*

The Supplemental Proxy Statement described the litigation commenced by Bolger:

---

**3.** This is true because Section 216 of the General Law of Delaware, the state where First State was incorporated, provides that unless otherwise specified by the certificate of incorporation or By–Laws of a corporation: "Directors shall be elected by a plurality of the votes...." Del.

Code Ann.Title 8, § 216. The By–Laws of First State state simply: "All matters other than the election of directors submitted to the stockholders at any meeting shall be decided by a majority of the vote casts [sic] with respect thereto." By–Laws, ¶ 6.

The Complaint alleges, among other things, that the Company violated Section 14(a) of the Securities Exchange Act of 1934 by soliciting proxies through proxy materials that failed to disclose: the existence of the Special Committee of the Board of the Company formed to investigate and report to the Board concerning the allegations made by plaintiff Bolger; his demand for the Board to take steps, including initiating legal action against officers and directors, including possibly the nominees proposed by the Board for election at the Annual Meeting; and the nature of the Special Committee's investigation.

The plaintiff sought a temporary restraining order enjoining the Company from disseminating the proxy materials for an annual meeting until proxy materials containing allegedly omitted material information have been filed and from holding an annual meeting until such proxy materials are filed and adequately disseminated. The Court declined to grant plaintiff's application for a temporary restraining order on December 21, 1990. The Complaint further seeks a preliminary and permanent injunction.

The Company believes that the allegations in the Complaint are without merit. Supplemental Proxy Statement at 2.

On 7 January 1990, Bolger filed his motion for a preliminary injunction. In support of this motion, Bolger argued the Proxy Statement violated section 14(a) of the Exchange Act by omitting material information, in that it failed to disclose:

(a) the existence of the Special Committee; (b) the nature of the Special Committee's investigation; (c) that director-nominee Quigley is grossly overcompensated in relation to his peers in the thrift industry and that the Special Committee is investigating his overcompensation and his responsibility for First State's precipitous losses; (d) that the board is giving active consideration to taking action against officers and directors of First State and DeWitt Savings, including Quigley, for their excessive compensation, mismanagement, breach of fiduciary duties, and other wrongdoing; (e) that shareholders owning 9.9% of First State's stock have informed the board that if the board does not take appropriate action in this regard, those shareholders will take action on behalf of all shareholders to redress these wrongs; and (f) that First State has engaged special counsel to investigate these matters and to render a written report.

Plaintiffs' Supp.Memorandum at 7–8.

Bolger argued preliminary injunctive relief is appropriate because of a probability of success on the merits and because of the danger stockholders will suffer irreparable harm without injunctive relief. As to probability of success on the merits, Bolger argued the information omitted from the Proxy Statement is material because it bears on the integrity and qualification of management and the nominees for election to the Board. Bolger argued irreparable harm will result without injunctive relief because shareholders will not be able to make an informed vote without the information he seeks to have disclosed. He further argued injunctive relief will require only a short delay in the annual meeting until First State is able to issue corrective materials. Finally, Bolger accused First State of "deliberately delaying the investigation of the Special Committee and the report of special counsel until *after* the January 16, 1991 annual meeting so that it can argue that the results and the final written report were not available at the time the proxy materials were distributed—or even before the annual meeting." Plaintiffs' Supplemental Memorandum at 15 (emphasis in original).

In opposition to the motion for a preliminary injunction, First State claimed it was not required by law to disclose the information characterized as material by Bolger. It also argued Bolger cannot demonstrate shareholders will be irreparably harmed without injunctive relief because the court may order a second shareholders' meeting and election for directors if the findings of the Special Committee substantiate the allegations of Bolger. It further argued that even if it was required to make such disclo-

sures, the motion of Bolger is largely moot in light of the disclosures made in the Supplemental Proxy Statement, which provide all information which Bolger demanded be disclosed except with respect to the compensation of officers and directors, which compensation was described in the original Proxy Statement.

In addition, Walter J. Davis ("Davis"), an outside member of the First State Board of Directors who is Chairman of the Special Committee, asserts:

> The Special Committee has been engaged in its investigation since August of 1990. The Special Committee is proceeding diligently with the investigation and is not acting with any intent to delay or otherwise manipulate the timing of the issuance of any recommendations or report of its investigation.

Davis Aff., ¶¶ 3, 4. The Special Committee has prepared no interim reports, and the final report will not be available until after the 16 January meeting. Stipulation of Facts, ¶ 16.

In their Reply, apparently now realizing First State had issued a Supplemental Proxy Statement, the Plaintiffs assert the Supplemental Proxy statement is misleading in various ways, without arguing that it is materially misleading or citing authority to support such a proposition. In specific, the Plaintiffs argue the Supplemental Proxy Statement is misleading because:

> (a) The supplemental proxy materials claim that the information contained therein is "furnished to shareholders as a result of the requirement to inform shareholders of certain pending litigation." This context is deliberately misleading because it falsely asserts that only the existence of this litigation is material; not the facts concerning the existence and investigation of the Special Committee, the subject matter of its investigation, the engagement and role of special counsel, or the demand by shareholders that the board take legal action, which are characterized as mere allegations. The misleading context of the supplemental proxy materials deliberately obfuscates and mischaracterizes these

facts[;] (b) The supplemental proxy materials still do not disclose (i) that the Special Committee has been conducting its "investigation" since July, (ii) that special counsel has been retained to investigate and render a written report, and (iii) that the results of the investigation and special counsel's report will not be disclosed [until] after the January 16 annual meeting of shareholders at which four incumbent directors will be elected to three-year terms on the board[;] (c) The supplemental proxy materials falsely imply that plaintiffs' demand that the board take legal action against the officers and directors has been fully disclosed "by Mr. Bolger through an amendment to his Beneficial Ownership Report on Schedule 13D", when in fact defendants have deliberately failed to disclose this demand to shareholders prior to the supplemental proxy materials. The Schedule 13D which Mr. Bolger filed as a matter of law does not excuse First State from complying with the proxy rules.

Reply at 4–5. In addition, the Plaintiffs assert irreparable harm will occur without injunctive relief by arguing:

> [A]lthough this court can certainly undo the result of the election and require First State to hold another annual meeting, this is only an 'exercise in futility.' There is no point in going forward with an annual meeting that may have to be held all over again.
>
> If First State is allowed to hold an annual meeting which will necessarily have to be repeated, the shareholders will be irreparably harmed. The company will be unnecessarily disrupted and the shareholders will be discouraged from participating in repetitive exercises.

Reply at 10.

Oral argument was held on 14 January 1991. The Parties agreed at oral argument that there was no factual dispute at issue, and that there was no reason why the hearing should not be converted to a final hearing on the merits. Accordingly, oral argument on the motion for a preliminary injunction was converted into a trial on the merits to determine whether the Plaintiffs

should be granted permanent injunctive relief. *See* Fed.R.Civ.P. 65(a)(2).[4]

Because the Plaintiffs have failed to demonstrate they will be irreparably harmed without permanent injunctive relief and because they have failed to raise equitable considerations warranting permanent injunctive relief by virtue of their failure to demonstrate the Proxy Statement and Supplemental Proxy Statement violated section 14(a), their motion is denied and the Verified Complaint is dismissed.

## DISCUSSION

■ The decision as to whether to grant permanent injunctive relief is left to the sound discretion of the trial court. *Lemon v. Kurtzman,* 411 U.S. 192, 200, 93 S.Ct. 1463, 1469, 36 L.Ed.2d 151 (1973). Permanent injunctive relief is an equitable remedy and will issue only " 'after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest.' " *Public Interest Research Group, Inc. v. Powell Duffryn Terminals, Inc.,* 913 F.2d 64, 82 (3d Cir.1990) (quoting *Natural Resources Defense Council v. Texaco Refining and Marketing, Inc.,* 906 F.2d 934, 941 (3d Cir.1990)). In addition, permanent injunctive relief will be granted "only where a threat of harm exists, not just where potential harm exists." *McLendon v. Continental Can Co.,* 908 F.2d 1171, 1182 (3d Cir.1990); *Roe v. Operation Rescue,* 710 F.Supp. 577, 588 (E.D.Pa.1989).

### A. *Irreparable Harm*

■ In enforcing the securities laws, courts have authority to fashion such remedies as seem appropriate to effect the Congressional purposes for the laws. *J.I. Case Co. v. Borak,* 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964) (stating principle); *Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 386, 90 S.Ct. 616, 622, 24 L.Ed.2d 593 (1970) (stating principle). Courts may void elections which were not based on fair disclosure and order new elections to be held. *Western District Council of Lumber Production v. Louisiana Pacific Corp.,* 892 F.2d 1412, 1415 (9th Cir.1989) (stating principle); *Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195, 1201 (2d Cir.1978) (voiding election); *D & N Financial Corp. v. RCM Partners Ltd. Partnership,* 735 F.Supp. 1242, 1253 (D.Del.1990) (stating principle); *FMC Corp. v. R.P. Scherer Corp.,* 545 F.Supp. 318, 322 (D.Del.1982) (stating principle); *Bertoglio v. Texas International Co.,* 488 F.Supp. 630, 663 (D.Del.1980) (voiding election). The Plaintiffs, therefore, are unable to show they will suffer irreparable harm if First State is not enjoined from holding the 16 January Meeting because the 16 January 1991 election may be voided and a new election ordered, if necessary.

In asserting the risk of irreparable injury, the Plaintiffs maintain that voiding an election does not forestall irreparable harm because " 'the wrongful positioning of corporate heads ... may require the unravelling of transactions wrongfully entered into.' " Plaintiffs' Supp.Memorandum at 20 (citing *Lebhar Friedman, Inc. v. Movielab, Inc.,* [1987 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 93,162, 1987 WL 5793 (S.D. N.Y.1987) (*"Lebhar"*)). In addition, the Plaintiffs argue that while the court has the power to undo an election and order another one, such action would be 'an exercise in futility.' " Reply at 10 (quoting *Newgard v. Electro-Nucleonics, Inc.* [1977 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,805, 1976 WL 849 (S.D.N.Y.1976)).

Such arguments by the Plaintiffs merely raise considerations of inconvenience which might result from the voiding of an election and fail to show how irreparable harm might occur without injunctive relief. Moreover, such arguments raise only a showing of potential inconvenience. In order to obtain permanent injunctive relief the Plaintiffs must show an actual threat of irreparable harm. *McLendon,* 908 F.2d at 1182; *Roe,* 710 F.Supp. at 588.

---

**4.** Rule 65(a)(2) provides in relevant part:
 *Consolidation of hearing with trial on the merits.* Before or after the commencement of the hearing of an application for a preliminary injunction, the court may order the trial of the action on the merits to be advanced and consolidated with the hearing on the application.
 Fed.R.Civ.P. 65(a)(2).

In addition, the enjoining of the 16 January 1990 election pending the issuance of additional proxy materials would serve no purpose. The Plaintiffs do not dispute that the slate of directors nominated for the 16 January 1990 election is unopposed. As conceded at the 14 January 1990 oral argument, each nominee owns stock and the proposed slate will be elected on a plurality vote. The Plaintiffs do not dispute they failed to propose a competing slate for the 16 January 1990 election and did not express any intention of doing so, assuming it would have been possible for them to do so at that late date. Therefore, if their request for relief were to be granted, the 16 January 1990 election would be enjoined, new Supplemental Proxy Statements would be issued, and a new election would be held, all for the purpose of what must inevitably be the same electoral results. Granting permanent injunctive relief in this case would truly be an exercise of futility.

Because the Plaintiffs have failed to show the presence of an actual threat of irreparable harm, they are not entitled to permanent injunctive relief. In addition, the Plaintiffs are not entitled to a permanent injunction because they have failed to raise equitable considerations warranting such relief by virtue of their failure to demonstrate First State violated section 14(a).

B. *Failure to Show a Violation of Section 14(a)*

Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), makes it a violation of the Exchange Act to violate the rules of the SEC promulgated thereunder. 15 U.S.C. § 78n(a).[5] Rule 14a–9 of the SEC prohibits the solicitation of proxies by means of communications rendered misleading by a material misrepresentation or omission. 17 C.F.R. § 240.14a–9.[6]

The Supreme Court has repeatedly observed that the purpose of section 14(a) is full and fair corporate suffrage. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 96 S.Ct. 2126, 2131–32, 48 L.Ed.2d 757 (1976); *Mills*, 396 U.S. at 381, 90 S.Ct. at 620; *J.I. Case Co.*, 377 U.S. at 431, 84 S.Ct. at 1559. The section is "to prevent management or others from obtaining authorization for corporate action by means of deceptive and inadequate disclosure in proxy solicitation. The section stemmed from the Congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.'" *J.I. Case Co.*, 377 U.S. at 431, 84 S.Ct. at 1559 (quoting H.R.Rep. No. 1383, 73d Cong., 2d Sess., 13). Section 14(a) ensures that "proxies are solicited with 'explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.'" *Mills*, 396 U.S. at 381, 90 S.Ct. at 620 (citing S.Rep. No. 792, 73d Cong., 2d Sess., 12).

A private right of action exists under section 14(a). *J.I. Case Co.*, 377 U.S. at 430–31, 84 S.Ct. at 1558–59. In order to make out a claim for a violation of section

---

**5.** Section 78n(a) provides:

It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise *in contravention of such rules and regulations as the Commission may prescribe as necessary and appropriate in the public interest or for the protection of investors,* to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

15 U.S.C. § 78n(a) (emphasis added).

**6.** Rule 14a–9 provides in relevant part:

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

17 C.F.R. § 240.14a–9(a).

14(a), a plaintiff must show that a proxy statement contained a material misrepresentation or omission, that the plaintiff was injured by the material misrepresentation or omission, and that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was "an essential link in the accomplishment of the transaction." *Mills*, 396 U.S. at 385, 90 S.Ct. at 622; *Ash v. GAF Corp.*, 723 F.2d 1090, 1092–93 (3d Cir.1983). In addition, the material misstatement or omission must be shown to have been the result of knowing, reckless or negligent conduct. *Gould v. American–Hawaiian Steamship Co.*, 535 F.2d 761, 777–78 (3d Cir.1976); *Bertoglio v. Texas Intern'l Co.*, 488 F.Supp. 630, 651–52 (D.Del.1980); *Berkman v. Rust Craft Greeting Cards, Inc.*, 454 F.Supp. 787, 790 (S.D.N.Y.1978); *National Home Products, Inc. v. Gray*, 416 F.Supp. 1293, 1312–13 (D.Del.1976).

The Supreme Court has defined "materiality" for purposes of section 14(a) as follows:

An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote.... It does not require proof of a substantial likelihood that disclosure of the omitted fact would have caused the reasonable investor to change his vote. What the standard does contemplate is a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder. Put another way, there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.

*T.S.C. Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. *See also Landy v. Amsterdam*, 815 F.2d 925, 933 (3d Cir.1987); *Fry v. Trump*, 681 F.Supp. 252, 261 (D.N.J.1988). As has been held since *TSC Industries*, the "total mix" of information is identified with reference to all publicly disseminated information of which the shareholders are presumably aware. *Bertoglio*, 488 F.Supp. at

642; *Valente v. PepsiCo., Inc.*, 454 F.Supp. 1228, 1242 (D.Del.1978); *Spielman v. General Host Corp.*, 402 F.Supp. 190, 195 (S.D. N.Y.1975), *aff'd per curiam*, 538 F.2d 39 (2d Cir.1976).

■ In determining whether a proxy statement constitutes a violation of section 14(a), decisions should not be based on semantic differences:

Rare indeed is the proxy statement whose language could not be improved upon by a judicial craftsman sitting in the serenity of his chambers.... "[N]ot every corporate counsel is a Benjamin Cardozo...." [N]itpicking should not become the name of the game.... Fair accuracy, not perfection, is the appropriate standard.

*Kennecott Copper Corp.*, 584 F.2d at 1200 (quoting *Ash v. LFE Corp.*, 525 F.2d 215, 221 (3d Cir.1975)) (citations omitted). *See also Plant Industries, Inc. v. Bregman*, 490 F.Supp. 265, 269 (S.D.N.Y.1980); *Laurenzano v. Einbender*, 448 F.2d 1, 6 (2d Cir.1971). In addition, there is a limit to the amount of disclosure required by section 14(a). Section 14(a) does not require shareholders to be buried in "an avalanche of trivial information." *TSC Industries*, 426 U.S. at 448–49, 96 S.Ct. at 2132. Such a requirement would defeat the purposes of that section, given that "[w]hen confronted with too much detail, it is impossible to discern what is really important." *Bank and Trust Co. of Old York Road v. Hankin*, 552 F.Supp. 1330, 1337 (E.D.Pa. 1982) (citing *TSC Industries*, 426 U.S. at 448, 96 S.Ct. at 2131–32).

With these general principles in mind, Bolger's assertions as to each alleged misrepresentation or omission are discussed as they were raised in the Plaintiffs' Supp. Memorandum and as they have been modified in the Reply in light of First State's issuance of the Supplemental Proxy Statement.

1. *Alleged Material Misrepresentations and Omissions of the Proxy Statement*

In the Plaintiffs' Supp.Memorandum, the Plaintiffs assert the Proxy Statement vio-

lated the requirements of section 14(a) because it did not disclose the existence of the Special Committee, the nature of its investigation, that the Board is giving active consideration to taking action against Quigley and other officers and directors of First State and DeWitt Savings for their excessive compensation, mismanagement, breach of fiduciary duties, and other wrongdoing, that stockholders owning 9.9% of company stock have threatened legal action if the Board fails to take legal action and that First State has engaged special counsel to investigate these matters and to issue a written report. Plaintiffs' Supp. Memorandum at 7–8.

In response, First State argues it was not required to disclose such matters in its Proxy Statement, and even if it was, it has cured such non-disclosure by issuing the Supplemental Proxy Statement. It maintains the Supplemental Proxy Statement discloses all allegedly material information which was omitted in the Proxy Statement, except that it does not characterize the compensation of Quigley as excessive. It asserts the compensation of Quigley is described in detail in the Proxy Statement and First State has no legal obligation to make characterizations.

■ A company has no duty to disclose to shareholders unsubstantiated allegations. *Lebhar*, ¶ 93,162 at 95,738 n. 5, *reargument denied,* [1987 Transfer Binder] Fed.Sec.L.Rep. ¶ 93,168, 1987 WL 6910 (S.D.N.Y.1987) ("Defendants were not required to disclose Lebhar's mere allegations."). *See also United States v. Matthews,* 787 F.2d 38, 45 (2d Cir.1986) (" 'Liability under Rule 14a–9 is predicated upon a showing that an allegedly omitted fact is true.' ") (quoting *Bertoglio,* 488 F.Supp. at 649); *Poughkeepsie Savings Bank, FSB v. Morash,* 1989 WL 40008 (S.D.N.Y.1989) (stating principle).

In addition, companies have no duty to disclose legal theories as to how a given transaction violated the law. *Seibert v. Harper & Row, Publishers, Inc.,* 1984 WL 21874 (Del.Ch.1984); *Bertoglio,* 488 F.Supp. at 649. Moreover, even after allegations have become the subject of a law-

suit, Regulation S–K requires disclosure only of non-routine pending litigation. 17 C.F.R. § 229.103. *See also GAF Corp. v. Heyman,* 724 F.2d 727, 739 (2d Cir.1983) ("[U]nadjudicated allegations in a pending civil action against a director-nominee should not automatically be deemed material. In a society as litigious as ours, where plaintiffs are permitted great latitude in their pleadings, a reasonable shareholder would not place much stock in the bald, untested allegations in a civil complaint....").

First State was under no obligation to disclose Bolger's mere allegations as to illegal conduct and mismanagement by First State officers and directors. Bolger can therefore not maintain that First State was obligated to disclose whatever preliminary steps it took in response to those allegations. In essence, Bolger argues First State was obligated to implicate its officers in wrong-doing based on his unproven charges. The securities laws " 'simply do not require management to accuse itself of antisocial or illegal policies....' " *GAF Corp.* at 740 (quoting *Amalgamated Clothing & Textile Workers Union v. J.P. Stevens & Co.,* 475 F.Supp. 328, 331–32 (S.D.N.Y.1979), *vacated as moot,* 638 F.2d 7 (2d Cir.1980) (per curiam)).

Bolger attempts to create liability for First State by pyramiding his legal claim on the as yet unsubstantiated allegations contained in his letters. He has not cited any authority which requires such a result. Bootstrapping a series of unsupported allegations does not result in a sound basis for this action. A reasonable First State shareholder would not consider what remain merely baseless allegations to be material in an election of an unopposed slate of director nominees.

Bolger's reliance on *Lebhar* is misplaced. In *Lebhar,* the court held the defendant corporation had a duty under Rule 14a–9 to disclose to shareholders prior to the shareholders' vote for directors the findings contained in the final draft of a special committee's report which was then available. The report was written upon the comple-

tion of an investigation conducted by a special committee established at the demand of a shareholder. The report found the Board was inexperienced in the defendant company's line of business and recommended reconsideration of the Chairman's employment contract. *Lebhar,* ¶ 93,163 at 95,738. While the court directed disclosure of the contents of the report as a completed report, the court observed the corporation had no duty to disclose *unsubstantiated* allegations of the shareholder. *Id.*

The reliance by the Plaintiffs on *Bradshaw v. Jenkins* is also misplaced. *See Bradshaw v. Jenkins* [1983–84 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 99,719 (W.D.Wash.1984). In *Bradshaw,* shareholders were to vote on the proposed merger of two companies. The court found there was a duty to disclose the allegations of a shareholder against one of the companies and the shareholder's threatened litigation against that company. *Bradshaw,* ¶ 99,719 at 97,910. The factual setting of *Bradshaw* is distinguishable from the instant case, however. In the context of a vote on the merger of two companies, unsubstantiated allegations and threats of litigation against one of the parties to a merger may be material as bearing on the future economic well-being of that company.

■ To the extent Bolger's allegations encompass corporate waste and mismanagement and the breach of fiduciary duties, the weight of authority holds companies have no duty to disclose such misconduct or mismanagement, even where proven. "Securities laws do not guarantee sound business practices and do not protect investors against reverses." *DiLeo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990). *See also, Wielgos v. Commonwealth Edison Co.,* 892 F.2d 509 (7th Cir.1989); *Koplin v. Labe Federal Savings and Loan Ass'n,* 748 F.Supp. 1336, 1343 (N.D.Ill.1990). "Corporations are creatures of state law, and investors commit their funds to corporate directors on the understanding that, except where federal law *expressly* requires certain responsibilities of directors with respect to

stockholders, state law will govern the internal affairs of the corporation." *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977) (quoting *Cort v. Ash,* 422 U.S. 66, 84, 95 S.Ct. 2080, 2090–91, 45 L.Ed.2d 26 (1975)) (emphasis in original).

A distinction is made between misconduct by directors which involves self dealing and misconduct which involves corporate waste or mismanagement. Under this approach, "[n]on-disclosure of the former is held to be presumptively material; the latter is never material." *Bank and Trust Co. of Old York Road,* 552 F.Supp. at 1335. One court has summarized the rationale for the distinction:

> This approach ... strikes a sound balance. Shareholders are permitted to recover when they are kept in the dark about a director who has been self-dealing without totally transforming the securities laws into an enforcement mechanism for all state created breaches of fiduciary duties.

*Id.* at 1336. *See also Maldonado v. Flynn,* 597 F.2d 789, 796 (2d Cir.1979). ("Efforts to dress up claims [of breaches of fiduciary duties] in a sec. 14(a) suit of clothes have consistently been rejected.... Since self-dealing presents opportunities for abuse of a corporate position of trust, the circumstances surrounding corporate transactions in which directors have a personal interest are directly relevant to a determination of whether they are qualified to exercise stewardship of the company.").

Self-dealing must be disclosed under the securities laws. *See Gaines v. Haughton,* 645 F.2d 761, 779 (9th Cir.1981), *cert. denied,* 454 U.S. 1145, 102 S.Ct. 1006, 71 L.Ed.2d 297 (1982). ("Absent credible allegations of self-dealing by the directors or dishonesty or deceit which inures to the direct, personal benefit of the directors—a fact that demonstrates a betrayal of trust to the corporation and shareholders and the director's essential unfitness for corporate stewardship we hold that director misconduct of the type traditionally regulated by state corporate law need not be disclosed in proxy solicitations for director elections.

This type of mismanagement, unadorned by self-dealing, is simply not material or otherwise within the ambit of the federal securities laws."); *Bertoglio*, 488 F.Supp. at 649 ("TI shareholders were entitled to know 'the circumstances surrounding corporate transactions in which directors have a personal interest,' since such information is 'directly relevant to a determination of whether [the directors] are qualified to exercise stewardship of the company.'"); *Berkman*, 454 F.Supp. at 791 ("Kidder's conflict of interest affected Kidder's credibility and was highly relevant in assessing the firm's per share price recommendation."); *Perelman v. Pennsylvania Real Estate Investment Trust*, 432 F.Supp. 1298, 1303 (E.D.Pa.1977); *SEC v. Kalvex, Inc.*, 425 F.Supp. 310, 315 (S.D.N.Y.1975).

Bolger alleges First State did not adequately disclose the compensation of Quigley because it did not characterize his compensation as "gross" over-compensation in relation to his peers in the thrift industry. Matters relating to the compensation of directors must be disclosed to shareholders because compensation implicates the risk of self-dealing. *Maldonado*, 597 F.2d at 796. The terms of compensation must also be disclosed to shareholders under the minimum disclosure requirements of Rule 14a–101.[7]

The terms of Quigley's compensation are described in great detail in the Proxy Statement. However, it is not necessary to characterize facts in a proxy solicitation if the facts themselves are disclosed. *Golub v. PPD Corp.*, 576 F.2d 759, 765 (8th Cir.1978); *Bertoglio*, 488 F.Supp.

at 649, 661; *Seibert, supra. Cf. Pantry Pride, Inc. v. Rooney*, 598 F.Supp. 891, 901 (S.D.N.Y.1984). Accordingly, First State did not violate Rule 14a–9 by failing to characterize the compensation of Quigley as "gross" over-compensation, a term chosen by Bolger. The disclosure of the terms of Quigley's compensation made by First State in the Proxy Statement was adequate under Rule 14a–9.

### 2. *Alleged Material Omissions and Misrepresentations of the Supplemental Proxy Statement*

Even if the alleged material omissions and misrepresentations of the Proxy Statement violated Rule 14a–9, First State cured such defects in its Supplemental Proxy Statement. First State informed shareholders in the Supplemental Proxy Statement it was making additional disclosure by way of the Supplemental Proxy Statement as a result of the requirement to inform shareholders of non-routine pending litigation. Supplemental Proxy Statement at 1.[8] In describing the legal action commenced by the Plaintiffs and the motion they brought in December for a temporary restraining order, the Supplemental Proxy Statement informs shareholders of Bolger's allegations of corporate mismanagement, waste of corporate assets, corporate misconduct and breach of fiduciary duties, of his demand for legal action against First State officers and directors, and of the formation of the Special Committee to investigate his allegations and to consider his demands. *Id.* The Supplemental Proxy Statement also advises shareholders Bolger filed his previous demand (the demand con-

---

**7.** Rule 14a–101 provides in relevant part:
 *Item 8. Compensation of directors and executive officers....*
 Furnish the information required by Item 402 ... of Regulation S–K if action is to be taken with regard to (i) the election of directors, (ii) any bonus, profit sharing or other compensation plan, contract, or arrangement in which any director, nominee for election as a director, or executive officer of the registrant will participate, (iii) any pension or retirement plan in which any such person will participate or (iv) the granting or extension to any such person of any options, warrants or rights to purchase any securities....
 17 C.F.R. § 14a–101.

**8.** First State refers to Regulation S–K, which provides in relevant part:
 **Item 103. Legal Proceedings**
 Describe briefly any material pending legal proceedings, other than ordinary routine litigation incidental to the business, to which the registrant or any of its subsidiaries is a party or of which any of their property is the subject. Include the name of the court or agency in which the proceedings are pending, the date instituted, the principal parties thereto, a description of the factual basis alleged to underlie the proceedings and the relief sought.
 17 C.F.R. § 229.103.

tained in his 3 July 1990 letter) with his Schedule 13D submitted to the SEC. *Id.*

First State, moreover, issued the Supplemental Proxy Statement in a timely fashion, mailing the Supplemental Proxy Statement to shareholders on 3 January 1991, thirteen days before the 16 January Meeting. Such issuance provided shareholders sufficient time to consider the information contained in the Supplemental Proxy Statement, especially in light of its relatively straightforward, uncomplex nature. *See, e.g., D & N Financial Corp.,* 735 F.Supp. at 1249–52 (issuance of supplemental proxy materials thirteen days before shareholder vote provided shareholders with adequate amount of time to consider materials); *Howell v. Management Assistance, Inc.,* 519 F.Supp. 83, 88 (S.D.N.Y.1981), *aff'd,* 685 F.2d 424 (2d Cir.), *cert. denied,* 459 U.S. 862, 103 S.Ct. 138, 74 L.Ed.2d 118 (1982) (same).

The Plaintiffs do not claim in their Reply that the Supplemental Proxy Statement fails to address the allegedly material omissions of the Proxy Statement or that the Supplemental Proxy Statement was not timely issued. Rather, they claim it discloses the information omitted in the Proxy Statement in a misleading manner. First, the Plaintiffs claim the Supplemental Proxy statement is misleading in that it states it was the commencement of their legal action, not First State's duty of disclosure in the first instance, which compelled First State to make the additional disclosure by way of the Supplemental Proxy Statement. Reply at 4. Second, the Plaintiffs claim the Supplemental Proxy Statement is misleading because it fails to disclose that the Special Committee has been investigating Bolger's allegations since July 1990, that Special Counsel has been retained to investigate the allegations and render a written report of its findings and that such report will not be disclosed until after the 16 January Meeting. *Id.* Third, the Plaintiffs claim the Supplemental Proxy Statement is misleading because it suggests First State was excused from making the disclosure of Bolger's allegations and demands made therein by virtue of Bolger having filed with the SEC a copy

of his 3 July 1990 letter, in which he first detailed his allegations and demands. Reply at 5. *See also* 3 July 1990 Bolger Letter to First State.

With respect to the first alleged misrepresentation, Bolger maintains First State misrepresented it had a legal obligation to disclose the existence of pending non-routine litigation, when such legal obligations applies to annual reports only. Reply at 6. However, it appears First State was obligated by Regulation S–K to disclose to shareholders non-routine pending litigation. 17 C.F.R. § 229.103.

■ Even if First State was not required to disclose the legal action brought by the Plaintiffs, Bolger fails to explain or cite authority supporting the proposition that such a characterization by First State as to its duty of disclosure was *materially* misleading. The Plaintiffs assert: "Once First State chose to disclose [the nature of its duty to disclose pending litigation], it is obligated to do so truthfully and in a manner not calculated to be deceptive." Reply at 7. However, a misrepresentation or omission is a violation of Rule 14a–9 only if it relates to a *material* fact. Even if First State misrepresented the nature of its duty of disclosure, such a misrepresentation would not be material to a reasonable shareholder faced with an uncontested election for directors and with a decision on whether to rescind anti-takeover provisions of the By–Laws. A finding that such an alleged misrepresentation violated Rule 14a–9 would not further the goal of section 14(a) as ensuring fair corporate suffrage.

The Plaintiffs further assert the Proxy Statement is misleading because it represents the charges of Bolger as mere allegations, when they contend the charges are fact. Reply at 7. As previously observed, First State had no duty to disclose in its proxy materials the allegations of the Plaintiffs. At present, Bolger's charges are untested and unsubstantiated. First State therefore is under no duty to represent the allegations of Bolger as established fact.

In addition, the Plaintiffs allege the Supplemental Proxy Statement is misleading because it fails to disclose that the investigation of the Special Committee commenced as early as July 1990 and that its report would not be completed until after the 16 January Meeting. The Plaintiffs seem to assert, without citing to authority, that such information is material to shareholders because from it they can infer the Special Committee is dragging its feet. However, the unchallenged Davis Affidavit asserts that the investigation of the Special Committee began its investigation in August 1990 and that the Special Committee is proceeding diligently and without any intent to delay or manipulate the timing of the issuance of its report. Davis Aff., ¶¶ 3, 4. Moreover, even if such an inference of foot-dragging may be made, such an inference would not be considered material by a reasonable shareholder faced with an uncontested election of directors and with a proposal to rescind anti-takeover provisions of the By–Laws.

Finally, without citing to authority, the Plaintiffs argue the Supplemental Proxy Statement was misleading because it implied First State had no duty to disclose the nature of Bolger's allegations and demands and the creation of the Special Committee by virtue of Bolger's disclosure of such information to the SEC. This argument rests on an assumption that First State was obliged to disclose Bolger's allegations and demands. As stated previously, First State had no such obligation, and therefore had no duty to disclose such the nature of such obligation. This argument is therefore without merit.

 The Plaintiffs have not demonstrated the Proxy Statement and Supplemental Proxy Statement violated Rule 14a–9 by virtue of containing material misstatements or omissions. In addition, even if the Proxy Statement and Supplemental Proxy Statement do contain material omissions or misrepresentations, the Plaintiffs have not demonstrated the Proxy State-

ment and Supplemental Proxy Statement form an "essential link in the accomplishment" of the election of directors. *See Mills*, 396 U.S. at 385, 90 S.Ct. at 622. First State was required under the Exchange Act to issue proxy materials prior to an election for directors. However, it was conceded by the Plaintiffs at the 14 January 1991 oral argument that the proposed slate of directors is uncontested, that each nominee owns stock and that directors are nominated by a plurality vote. Even if the Proxy Statement and Supplemental Proxy Statement contain misstatements or omissions within the meaning of Rule 14a–9, the proposed slate of directors would ultimately be elected even if the relief sought by the Plaintiffs were to be granted. Thus, the Plaintiffs have failed to prove a casual link between any alleged material misrepresentations or omissions and the election of the proposed slate of directors.[9]

The Plaintiffs have failed demonstrate they would suffer irreparable harm without a permanent injunction and have failed to raise equitable considerations warranting such relief by virtue of their failure to demonstrate the Proxy Statement and Supplemental Proxy Statement violated Rule 14a–9. Their motion for permanent injunctive relief is denied and the Verified Complaint is dismissed.

## CONCLUSION

For the foregoing reasons, the motion of the Plaintiffs for a permanent injunction enjoining First State from holding the 16 January Meeting is denied. The Verified Complaint is dismissed.

---

**9.** In view of these findings, it is unnecessary to consider whether the Plaintiffs have satisfied the remaining conditions to state a section 14(a)

violation consisting of a showing of potential injury and a showing of fault.